[No. 41902-5-II.   Division Two.   June 4, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. MARTIN A. JONES, *Appellant*.

*Thomas M. Kummerow* (of *Washington Appellate Project*), for appellant.

*Robert W. Ferguson, Attorney General,* and *John C. Hillman, Assistant,* for respondent.

¶1 WIGGINS, J.[*] — Martin A. Jones appeals his jury conviction for attempted first degree murder. Jones argues that his constitutional right to a public trial and his right to be present were violated when, during a court recess off the record, the trial court clerk drew four juror names to determine which jurors would serve as alternates. In light of our Supreme Court's recent public trial cases that make virtually any courtroom closure structural error, we agree with Jones that the trial court violated his public trial rights. Accordingly, we vacate his conviction and remand for a new trial.

¶2 In the unpublished portion of this opinion, we address Jones's other contentions. First, he challenges his conviction on the basis of improperly suggestive and unreliable photo identification procedures. Second, he argues that the trial court, in disallowing certain testimony and evidence, violated his constitutional right to present a defense. Finally, in a pro se statement of additional grounds,[1] Jones challenges his conviction for several other reasons. Unlike the public trial issue, we hold that none of these arguments presents reversible error.

## FACTS

I.  FACTUAL BACKGROUND

¶3 Early in the morning on February 13, 2010 in Long Beach, Washington State Patrol Trooper Jesse Greene pulled over a minivan driven by Susan Jones,[2] Jones's wife, for driving in excess of the speed limit. Trooper Greene believed Susan Jones was intoxicated and began conducting field sobriety tests. During this time, Trooper Scott Johnson

---

[*] Justice Charles K. Wiggins is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

[1] RAP 10.10.

[2] For clarity, we will refer to Susan Jones by her first and last name and will refer to Martin Jones, the appellant, simply as Jones.

arrived as backup. Trooper Greene arrested Susan Jones for driving under the influence.

¶4 Trooper Johnson asked Susan Jones if there was someone available who would pick up the minivan, to which she replied "Marty" and provided a phone number. Trooper Johnson wrote "Marty" and the phone number on his hand. Trooper Greene then took Susan Jones to the Long Beach Police Department for processing. Shortly after being placed into custody, Susan Jones sent text messages to Jones informing him of her arrest.

¶5 Before leaving the scene, Trooper Greene requested a towing company to tow the minivan. Trooper Johnson began processing the minivan's contents until George Hill, owner of Hill Auto Body & Towing, arrived in short order.

¶6 As the minivan was being prepared for towing, Trooper Johnson noticed a white male approaching. This white male was visibly agitated and spoke to Hill, asking him what he was doing. Hill indicated that he was preparing the vehicle for towing. As the unidentified white male began walking away, Trooper Johnson contacted him and asked if he needed help with anything. The white male responded that he did not need help and continued walking away.

¶7 Trooper Johnson went back to processing the minivan's contents. Sometime later, Hill saw a white male approach Trooper Johnson from behind and grab him. Hill heard a gunshot and smelled gunpowder. The white male had shot Trooper Johnson in the back of the head. Trooper Johnson, still conscious, made eye contact with the man who had shot him and returned fire. Hill also gave chase, but the man fired upon him; then, Hill returned to assist Trooper Johnson. Trooper Johnson watched the shooter flee.

¶8 Hill contacted the Washington State Patrol dispatcher, who notified law enforcement personnel. Long Beach police arrived, and one of the officers took Trooper

Johnson to Ocean Beach Hospital in Ilwaco. The physician who initiated treatment, arranged for Trooper Johnson's transfer to Oregon Health Sciences University Hospital (OHSU) to ensure that Trooper Johnson had access to a trauma surgeon.

¶9 At the scene, investigating officers found one .22 caliber short cartridge casing where Trooper Johnson had been shot. The cartridge was stamped with the logo for Cascade Cartridge Inc., an ammunition manufacturer.

¶10 Officers at the scene employed two K-9 units to track the scent from the shooting scene. One of these units led to the block on which Martin and Susan Jones resided. Police realized that the dog was approaching Susan Jones's home.

¶11 Police surrounded the Joneses' home. Jones exited the home and walked toward the beach. Police followed him and detained him at gunpoint. Jones told police that he was going for a morning walk on the beach and that he had been asleep all night. Police questioned Jones but released him during further investigation.

¶12 Meanwhile, Trooper Johnson recuperated at OHSU for about three days following the shooting. During this time he was shown several photographs of potential suspects in photomontages, as well as individual photographs. Trooper Johnson did not identify the shooter in any of these photos. Trooper Johnson began asking to see a photo of Susan Jones's husband, which officers eventually showed him. Trooper Johnson identified Jones as the shooter.

¶13 Following Trooper Johnson's identification, officers arrested Jones, who continued to claim he was at home asleep at the time of the shooting. Police obtained warrants to search his home and phone records. The phone records disclosed several phone calls exchanged between Jones and his neighbor in the early morning hours of February 13, 2010. A search of Jones's home disclosed a box of .22 caliber Cascade Cartridge Inc. ammunition manufactured in 1999,

which matched the .22 shell casing found at the scene of Trooper Johnson's shooting.

## II. PRETRIAL PROCEEDINGS

¶14 The State charged Jones with attempted first degree murder. Jones was initially arraigned in Pacific County, but due to pretrial publicity, Jones requested a venue change. The court granted Jones's motion and transferred the case to Thurston County Superior Court. Jones filed an affidavit of prejudice against Thurston County Superior Court Judge Pomeroy. Unable to accommodate the trial in Thurston County following the affidavit, the case was transferred back to Pacific County. Pacific County Superior Court then transferred venue to Pierce County.

¶15 The parties exchanged several pretrial evidentiary motions. Jones planned to present evidence that Trooper Greene had observed a different white male walking past the minivan 40 minutes before the shooting, just after stopping Susan Jones. The State successfully moved to exclude this evidence as impermissible "other suspect" evidence.

¶16 Jones also moved to suppress Trooper Johnson's eyewitness identification or alternatively present expert testimony regarding the questionable reliability of eyewitness identifications. The court denied Jones's motion to suppress but allowed his expert to testify.

## III. TRIAL

¶17 During trial, Jones sought to impeach the testimony of Sara Trejo, the Washington State Patrol Crime Lab's fingerprint analyst, with the e-mail of Chris Sewell, who had called the State's investigation "haphazard" and otherwise had criticized communication breakdowns among law enforcement agencies. The trial court denied the use of the e-mail for impeachment, concluding that the e-mail was a collateral matter. Jones later sought to present the testi-

mony of Chris Sewell in his case in chief, but the court excluded this testimony as unduly prejudicial under ER 403.

¶18 At the conclusion of the evidence, the court indicated that the court clerk would randomly draw the names of four jurors from a rotating cylinder to determine which jurors would be alternates. During the defense's closing arguments, there was a court recess during which the court clerk randomly pulled four jurors' names. The court announced the names of the four alternate jurors following closing arguments and excused these jurors. Jones did not object to any aspect of the alternate juror drawing.

¶19 The jury found Jones guilty of attempted first degree murder and returned a verdict that included a firearm sentencing enhancement. Following the verdict, Jones moved for a new trial, claiming that the random drawing of alternate jurors violated his right to a public trial and right to be present and appear and defend. He also asserted that he should have been able to present evidence that another suspect shot Trooper Johnson. The trial court denied Jones's motions. Jones appealed.

## ANALYSIS

I. JONES'S RIGHT TO A PUBLIC TRIAL WAS VIOLATED BECAUSE THE DRAWING FOR ALTERNATE JURORS WAS NOT DONE IN OPEN COURT, ENTITLING JONES TO A NEW TRIAL

¶20 The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to a public trial. The state constitution also requires that "[j]ustice in all cases shall be administered openly." CONST. art. I, § 10. A defendant does not waive his public trial right by failing to object to a closure during trial. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). " 'Whether a criminal accused's constitutional public trial right has been violated is a question of law, subject to de novo review on direct appeal.' " *Wise*, 176 Wn.2d at 9 (quoting *State v. Easterling*, 157 Wn.2d 167, 173-74, 137 P.3d 825 (2006)).

¶21 Under our Supreme Court's recent guidance on the public trial right, we first determine whether a closure that triggers the public trial right occurred by asking if, under considerations of experience and logic, "the core values of the public trial right are implicated." *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012) (lead opinion).[3] If there is a closure, we look to whether the trial court properly conducted a *Bone-Club*[4] analysis before closing the courtroom. *State v. Paumier*, 176 Wn.2d 29, 35, 288 P.3d 1126 (2012); *Wise*, 176 Wn.2d at 12. If the trial court failed to do so, then a "per se prejudicial" public trial violation has occurred "even where the defendant failed to object at trial." *Wise*, 176 Wn.2d at 18. The remedy is typically a new trial. *Wise*, 176 Wn.2d at 19.

¶22 Applying these standards to this case, we conclude that the trial court violated Jones's public trial right, so he is entitled to a new trial. The drawing of alternate jurors occurred off the record during a court recess. The trial court failed to engage in a *Bone-Club* analysis, resulting in an error that is per se prejudicial. We must therefore vacate Jones's conviction and remand this case for retrial.

A.   The Experience and Logic Test Indicates That the Alternate Juror Drawing Constituted a Closure

¶23 The United States Supreme Court originally developed the experience and logic test to determine whether the public's right to access trials attaches under the First Amendment to the United States Constitution. *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 7, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (*Press* II). The experience prong of the test "asks 'whether the place and process have historically been open to the press and general public.' " *Sublett*,

---

[3] Although *Sublett* was a splintered decision, at least five justices voted to adopt the experience and logic test. *See* 176 Wn.2d at 73 (lead opinion), 136 (Stephens, J., concurring) ("I . . . believe considerations of logic and experience appropriately guide the determination of when the public trial right attaches.").

[4] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

176 Wn.2d at 73 (quoting *Press* II, 478 U.S. at 8). In other words, the court engages in an historical inquiry to determine whether the type of procedure is one that has traditionally been open to the public. "The logic prong asks 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press* II, 478 U.S. at 8). Relevant to the logic inquiry are the overarching policy objectives of having an open trial, such as fairness to the accused ensured by permitting public scrutiny of proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."); *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005) ("The public trial right serves to ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury."). If both prongs of the experience and logic test are implicated, the public trial right attaches, and the "*Bone-Club* factors must be considered before the proceeding may be closed to the public." *Sublett*, 176 Wn.2d at 73. We proceed to provide a more detailed experience and logic analysis.

1. The Washington "experience" of selecting alternate jurors is varied but is typically part of voir dire, which is performed in open court

¶24 Although selecting alternate jurors has not received a great deal of attention in Washington, our courts' historical and current practices indicate that alternate juror selection is largely performed at the same time and in the same way as voir dire, and thus occurs on the record in a courtroom that is open to the public. Therefore, the experience of alternate jury selection in this state has been one that traditionally the public has been able to witness.

¶25 At common law, if a juror became incapacitated, the entire jury was discharged, a new jury was selected, and the

case retried. *See* Recent Case, People v. Von Badenthal, *8 Cal. App. 2d 404, 48 P.2d 82 (1935)*, 11 WASH. L. REV. 106, 110 (1936) (citing *Dennis v. State*, 96 Miss. 96, 50 So. 499 (1909); *State v. Hasledahl*, 2 N.D. 521, 52 N.W. 315 (1892)). Washington's variant of the common law rule allowed the trial to continue without an incapacitated juror if both parties agreed or a retrial of the case before a new jury if the parties did not agree. HILL'S CODE OF PROC. § 360. Washington had no rules directly on point for juror incapacitation in criminal cases and applied civil jury rules in all cases until 1917. *See* REM. 1915 CODE § 2137 (juror rules in criminal trials governed by civil rules); PIERCE'S CODE § 8511 (1919) (civil rules for juror incapacitation unchanged since 1891).

¶26 In 1917, the legislature passed Senate Bill 136, titled "Alternate Jurors in Criminal Actions." LAWS OF 1917, ch. 37, § 1. It provided in pertinent part,

> Whenever, in the opinion of a judge of a superior court about to try a [felony] defendant [and] the trial is likely to be a protracted one, the court may cause an entry to that effect to be made in the minutes of the court, and thereupon, immediately after the jury is impaneled and sworn the court may direct the calling of one or two additional jurors, in its discretion, to be known as "alternate jurors." Such jurors must be drawn from the same source, and in the same manner, and of the same qualifications as the jurors already sworn, to be subject to the same examination and challenge . . . . If, before the final submission of the case, a juror die, or become ill, so as to be unable to perform his duty, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box and be subject to the same rules and regulations as though he had been elected as one of the original jurors.

LAWS OF 1917, ch. 37, § 1. Thus, Washington's first enactment regarding alternate jurors not only specified a particular procedure for the alternate juror selection, but it specifically instructed that alternate jurors be called in the same manner as deliberating jurors and subject to for-cause and peremptory challenges in open court. This statute

remained in effect until 1984. *See* former RCW 10.49.070 (1917), *repealed by* LAWS OF 1984, ch. 76, § 30(6).

¶27 Criminal Rule (CrR) 6.5 superseded former RCW 10.49.070. It directs that "[w]hen the jury is selected the court may direct the selection of one or more additional jurors, in its discretion, to be known as alternate jurors." CrR 6.5 also states that when "a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury." CrR 6.5, like former RCW 10.49.070, contemplates that all jurors—whether deliberating jurors or alternate jurors—are selected at the same time through the same process.

¶28 Washington's pattern jury instructions also indicate that alternate juror selection occurs before trial during voir dire. 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL App. C at 787-88 (3d ed. 2008) ("If alternate jurors are to be empaneled, they should be called, questioned on voir dire[,] and instructed on their duties as alternates at this time.").

¶29 Another provision instructs the judge to address the alternate jurors by stating, "At the outset of this trial, you were selected to serve in case one of the jurors became unable to serve on the jury." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.69, at 23 (3d ed. Supp. 2011). The pattern jury instructions thus indicate that the trial courts should handle matters pertaining to alternate jurors in the same manner as their deliberating counterparts.

¶30 Under Washington's civil rules, "[a]lternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath, and shall have the same functions, powers, facilities, and privileges as the regular jurors." CR 47(b). Where one to two alternates will be empaneled, each party receives one additional peremptory challenge. CR 47(b). In the case of three or four

alternates, each party may exercise two additional peremptory challenges, and in the case of five to six alternates, each party receives three additional peremptory challenges. CR 47(b). Thus, Civil Rule 47(b) also contemplates that alternate jurors are treated in the same manner as regular jurors during voir dire.

¶31 Several local superior court rules are consistent with selecting alternate jurors as part of the voir dire process. A few local rules refer to the "struck jury" method. A "struck jury" is "[a] jury selected by allowing the parties to alternate in striking from a list any person whom a given party does not wish to have on the jury, until the number is reduced to the appropriate number (traditionally 12)." BLACK'S LAW DICTIONARY 935 (9th ed. 2009). This manner of alternate juror selection would occur as part of the voir dire process. This is the jury selection method in Whitman, Pacific, Thurston, Asotin, Columbia, and Garfield Counties. *See* WHITMAN COUNTY SUPER. CT. LOCAL CIV. R. 47(A); PACIFIC COUNTY SUPER. CT. LOCAL CIV. R. 4(A); THURSTON COUNTY STRUCK JURY HANDBOOK (rev. May 13, 2009), *available at* www.co.thurston. wa.us/superior/documents/Struck%20Jury%20Handbook. pdf; HELLS CANYON CIRCUIT LOCAL R. 7(B).

¶32 Other local court rules provide more varying methods for alternate juror selection. In Grant County civil cases, jurors are assigned roster numbers and are then eliminated through usual for-cause and peremptory challenges. GRANT COUNTY SUPER. CT. LOCAL CIV. R. 47(c). The remaining 12 jurors with the lowest roster numbers become the jury and the remaining jurors with the next lowest roster numbers are seated as alternate jurors. GRANT COUNTY SUPER. CT. LOCAL CIV. R. 47(c). In Okanogan County Superior Court, parties may stipulate that an alternate juror be designated by random drawing following closing arguments, "[i]n lieu of the procedure designated by statute." OKANOGAN COUNTY SUPER. CT. LOCAL R. 9(b). Presumably, the "procedure designated by statute" is the procedure employed by former RCW

10.49.070, discussed above. In Kitsap County, the clerk assigns all jurors random numbers beginning with the number one.[5] KITSAP COUNTY SUPER. CT. LOCAL CIV. R. 47(a)(1). Generally alternates are questioned during voir dire in the same way as regular jurors. KITSAP COUNTY SUPER. CT. LOCAL CIV. R. 47(a)(1)(C), (3)-(4).

¶33 Taken together, both the historic and current practices in Washington reveal that the procedure for selecting alternate jurors, like the selection of regular jurors, generally occurs as part of voir dire in open court. As our Supreme Court has recognized, voir dire has traditionally been and must continue to be open to the public. *See State v. Momah*, 167 Wn.2d 140, 148, 217 P.3d 321 (2009); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004); *see also Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984). Thus, even though various Washington courts might employ slightly differing methods to select alternate jurors, we conclude that the Washington experience of alternate juror selection is one connected to the voir dire process for jury selection. Therefore, alternate juror selection, under our experience, has been and continues to be publicly open.

    2.   Considerations of "logic" indicate that a drawing of alternate jurors implicates the core concerns of the constitutional right to public trial

■ ■ ¶34 Turning to the logic prong of the experience and logic test, our inquiry focuses on the purposes of the public trial right and the constitutional assurance of open courts. Washington courts have recognized these purposes as ensuring a fair trial, reminding court officers of the importance of their duties, encouraging witnesses to come forward, and discouraging perjury. *Sublett*, 176 Wn.2d at 72; *Brightman*, 155 Wn.2d at 514. Two of the purposes of the public trial right are implicated in this case: basic fairness

---

[5] If the defendant objects to this procedure, the clerk will draw the numbers in open court at the beginning of trial. KITSAP COUNTY SUPER. CT. LOCAL CIV. R. 47(a)(1).

to the defendant and reminding the trial court of the importance of its functions.

¶35 At least three times before and during trial, the trial court indicated that it would randomly draw alternate jurors at the trial's conclusion. *See* 1 Verbatim Report of Proceedings (VRP) at 35 ("If we are not going to tell [the jurors that they are alternates], then it's random and we pull it out of the rotating cylinder, and it's whoever is left is who is eligible to be selected out."); 23 VRP at 3808 ("[The drawing] will be random. The box to be spun looks a little like an old fashioned bingo, but it's wooden. [The court clerk] has all 16 of your juror numbers, and after all of the closing arguments she will tell me which four numbers have been selected at random. We don't know now."); 25 VRP at 4061 ("[F]our jurors number [sic] were pulled randomly, and at this time I am temporarily excusing these four jurors . . . ."). But a court staff member conducted the drawing during an afternoon court recess, which was announced to Jones, counsel, and the jurors after it occurred. Thus, the alternate juror drawing occurred off the record and outside of the trial proceedings.

¶36 Although we do not suggest that the alternate juror drawing in this case was anything but random—and Jones does not appear to argue otherwise—there is simply no way to tell how the drawing was performed. The issue is not that the drawing in this case was a result of manipulation or chicanery on the part of the court staff member who performed the task, but that the drawing could have been. Where such a drawing occurs during a court recess off the record, the defendant and the public lack the assurance of a truly random drawing that they would have if the drawing were performed in open court on the record. This lack of assurance raises serious questions regarding the overall fairness of the trial and indicates that court personnel should be reminded of the importance of their duties. Accordingly, we conclude that considerations of logic "implicate the core values the public trial right serves." *Sublett*, 176 Wn.2d at 72.

B. The Trial Court Failed To Perform a *Bone-Club* Analysis, Resulting in an Error That Is Presumed Prejudicial, Entitling Jones to a New Trial

¶37 Having determined that both experience and logic require that an alternate juror drawing be conducted in open court, Jones's public trial right attaches. *Sublett*, 176 Wn.2d at 73. Thus, the trial court was required to consider the *Bone-Club* factors[6] before permitting the alternate juror drawing off the record.

¶38 "The trial court's failure to consider and apply *Bone-Club* before closing part of a trial"—the alternate juror drawing—was error. *Wise*, 176 Wn.2d at 13. "Violation of the public trial right, even when not preserved by objection, is presumed prejudicial to the defendant on direct appeal." *Wise*, 176 Wn.2d at 16. Permitting a violation of the public trial right to go unchecked "would erode our open, public system of justice and could ultimately result in unjust and secret trial proceedings." *Wise*, 176 Wn.2d at 18.

¶39 In *Wise*, our Supreme Court noted that " ' "[t]he remedy should be appropriate to the violation." ' " *Wise*, 176 Wn.2d at 19 (alteration in original) (quoting *Bone-Club*, 128 Wn.2d at 262 (quoting *Waller v. Georgia*, 467 U.S. 39, 50, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984))). The court went on

---

[6] Under *Bone-Club*, trial courts must consider five factors prior to closing the proceedings:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

"5. The order must be no broader in its application than necessary to serve its purpose."

128 Wn.2d at 258-59 (alteration in original) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

to state that where the violation in question occurs as part of an "easily separable part of a trial," remand for a public hearing, rather than for a new trial, might be appropriate. *Wise*, 176 Wn.2d at 19. But where "[t]he jury would necessarily be differently composed[ ] and it is impossible to speculate as to the impact of that on [the] trial," the appropriate remedy is a new trial. *Wise*, 176 Wn.2d at 19. Therefore, we hold that the violation of the public trial right entitles Jones to a new trial.

II. DRAWING ALTERNATE JURORS OUTSIDE OF JONES'S PRESENCE DID NOT VIOLATE HIS RIGHT TO BE PRESENT OR TO APPEAR AND DEFEND UNDER THE FEDERAL OR STATE CONSTITUTIONS

¶40 In addition to his public trial claims, Jones contends that by allowing the random juror drawing to be done outside his presence, the trial court violated his constitutional right to be present under the confrontation clause of the Sixth Amendment, the due process clause of the Fourteenth Amendment, and article I, section 22 of the Washington Constitution. Because the random juror selection was not a critical phase of Jones's trial and did not have any effect on his substantial rights, we hold that no violation of his right to be present occurred. Moreover, even if Jones's trial suffered from error on this point, the error was harmless beyond a reasonable doubt.

¶41 Like the public trial right, the right to be present is a constitutional question under the confrontation clause and due process clause of the Sixth and Fourteenth Amendments, respectively. Article I, section 22 of the Washington Constitution protects a criminal defendant's right to "appear and defend." Constitutional questions are reviewed de novo. *State v. McCuistion*, 174 Wn.2d 369, 387, 275 P.3d 1092 (2012), *cert. denied*, 133 S. Ct. 1460 (2013). We review Jones's right-to-be-present claim under the federal constitution and the state constitution in turn.

A. Jones's Right To Be Present Was Not Violated under the Due Process Clause of the Fourteenth Amendment

¶42 Washington courts apply federal constitutional law to asserted violations of defendants' rights to be present at trial. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011); *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 920, 952 P.2d 116 (1998). Although the right to be present originated in the confrontation clause of the Sixth Amendment, the United States Supreme Court has applied the due process clause of the Fourteenth Amendment in situations where defendants are not actually confronting witnesses or evidence against them. *See United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (per curiam); *Rushen v. Spain*, 464 U.S. 113, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983).

¶43 The defendant's presence is constitutionally required "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *see also Gagnon*, 470 U.S. at 526. Because the defendant's presence must be reasonably substantially related to his or her ability to defend, the right is not triggered where "presence would be useless, or the benefit but a shadow." *Snyder*, 291 U.S. at 106-07.

¶44 The random drawing of jurors' names to determine who would be alternates was not a critical phase of the trial. Jones had the opportunity during voir dire to question, challenge, and ultimately select all the jurors, including those who were randomly selected as alternates, well before the alternate drawing. Although the initial juror selection is "a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present," *Gomez v. United States*, 490 U.S. 858, 873, 109 S.

Ct. 2237, 104 L. Ed. 2d 923 (1989), voir dire vastly differs from the administrative function of later randomly selecting alternate jurors. Although this selection violated Jones's public trial right, nothing about the alternate juror selection had any relation, let alone a reasonably substantial one, to Jones's ability to defend against the attempted murder charge.

¶45 Jones relies on *Irby* for the proposition that any selection of jurors, even alternate jurors at the end of trial, implicates his due process rights. In *Irby*, the judge, prosecution, and defense exchanged e-mails regarding juror responses to the juror questionnaire, including possible dismissals of jurors for hardship and for cause. 170 Wn.2d at 878, 884. When these e-mails were sent, Irby was in jail and his attorneys never communicated with him regarding the contents of the e-mails. *Irby*, 170 Wn.2d at 884. Noting that the right to be present during jury selection attaches when the work of empaneling the jury begins, the court held that because e-mails regarding jury selection were part of empanelment, "conducting jury selection [by e-mail] in Irby's absence was a violation of his right under the due process clause." *Irby*, 170 Wn.2d at 884.

¶46 Notably, *Irby* involves the defendant's right to be present during the initial jury selection, not the alternate juror drawing at the trial's end. Unlike *Irby*, at the time alternates were excused, Jones's jury had been empaneled and present at his trial for more than five weeks. Jones's situation simply does not implicate the right to be present addressed in *Irby*. We hold that the alternate juror selection was not a critical stage that triggered Jones's right to be present under the due process clause of the United States Constitution.

B. The Alternate Juror Drawing Did Not Violate Jones's Right To Appear and Defend under Article I, Section 22 of the State Constitution

¶47 Article I, section 22 of the Washington Constitution provides that "[i]n criminal prosecutions the accused

shall have the right to appear and defend in person." In *Irby*, our Supreme Court recognized that the state constitutional right to appear and defend is arguably broader than the federal due process right to be present. 170 Wn.2d at 885 n.6. The *Irby* court based this determination in part on *State v. Shutzler*, 82 Wash. 365, 367, 144 P. 284 (1914), *overruled in part on other grounds by State v. Caliguri*, 99 Wn.2d 501, 664 P.2d 466 (1983), in which the Supreme Court stated that "it is the right of the accused to be present at every stage of the trial when his substantial rights may be affected." Thus, in Washington, the right to appear and defend as guaranteed by article I, section 22 of the Washington Constitution is triggered at any time during trial that a defendant's substantial rights may be affected.

¶48 The alternate juror drawing in this case is not one of those times. As already discussed, Jones had the opportunity to participate in the selection of 16 jurors during voir dire. After the excusal of 4 jurors, any variation in the makeup of the remaining jurors should have been satisfactory to Jones, regardless of whether he was present when the selection of alternates occurred. *See State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995) (holding that because "[t]he Defendant participated in [the jurors'] selection and the entire panel, both regular jurors and alternates, was ultimately accepted by the Defendant," the fact that an alternate mistakenly deliberated in the case caused no prejudice). The trial court's alternate juror selection procedure therefore did not violate Jones's right to appear and defend under article I, section 22 of the Washington Constitution.

C.   Jones's Absence at the Time Alternate Jurors Were Drawn, if Error at All, Was Harmless Error beyond a Reasonable Doubt

¶49 Both the federal due process right to be present and the state constitutional right to appear and defend are subject to harmless error analysis. *Rushen*, 464 U.S. at

117-18; *Irby*, 170 Wn.2d at 885-86. "The burden of proving harmlessness is on the State and it must do so beyond a reasonable doubt." *Caliguri*, 99 Wn.2d at 509. "Nonetheless, the defendant must first raise at least the possibility of prejudice." *Caliguri*, 99 Wn.2d at 509.

¶50 Jones does not demonstrate a possibility of prejudice. He participated in and accepted the selection of 16 jurors, knowing that only 12 of them would ultimately deliberate. Because 12 of them did actually deliberate and come to a verdict—exactly as Jones expected—Jones cannot now say that the fact that he was not present at the time of the random selection of the 12 deliberating jurors prejudiced him. Even if Jones's absence during the random selection of alternate jurors was error, the error was harmless.

¶51 Our Supreme Court's recent decisions on the public trial right have decided this case for us. Because Jones's right to a public trial was violated when alternate jurors were selected during a court recess off the record, we must presume Jones was prejudiced. However, we reject Jones's claimed error with regard to his right to be present at the time the alternate juror drawing occurred. We vacate the trial court's conviction of Jones for attempted first degree murder and remand this matter for a new trial.

¶52 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, A.C.J., and Bridgewater, J. Pro Tem., concur.

Petition for Supreme Court review filed September 26, 2013.