IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69835-4-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| TONY RAY THOMAS, | ) | UNPUBLISHED OPINION |
| AKA ANTONNIO RAY THOMAS, | ) | |
| | ) | FILED: October 6, 2014 |
| Appellant. | ) | |

BECKER, J. — This opinion affirms appellant Antonio Thomas' conviction for assault in the second degree. We conclude Thomas received a fair and public trial.

The victim of the assault was Vivian Heller, the grandmother of Thomas' three children and the mother of his former partner, Shant'e Spears.

In late April 2012, Heller, her boyfriend Raymond Jennings, and Thomas' two older children were in a serious car accident on a road trip through California. Spears had allowed the children to go on this road trip but specifically forbade Jennings from driving the car. Spears did not tell Thomas about the trip or ask his permission. Jennings was driving when the car went over a cliff and was caught by two trees. The children incurred injuries in the accident. Heller called

Spears to tell her about the accident. Spears called Thomas. Spears and Thomas flew down to California to pick up their children.

On May 28, 2012, Heller and Jennings attended a Memorial Day party at a motorcycle club in the Georgetown neighborhood. Thomas was also there. Jennings and Thomas were both members of the club. Thomas walked into a back room with Heller. Heller emerged with a bloodied face. Jennings found her and took her to the hospital. Someone at the hospital called the police. Seattle police officer Ryan Keith responded around 1:00 a.m. that night and observed that Heller had swelling in her face and a bloody and broken nose. He photographed Heller's injuries and took statements from Heller, Jennings, and a woman in the hospital room. Heller told the officer that Thomas had backed her up into a large barrel and the club's fence and punched her repeatedly in the face with his closed fist.

Detective Adam Thorp was the investigating officer. Based on witness statements and Officer Keith's photos, Thorp concluded he had probable cause to arrest Thomas. He went to Thomas' residence to arrest him on June 4, 2012, but Thomas was not there. Thorp put out a bulletin to other officers indicating probable cause to arrest Thomas. As a result, another officer contacted Thomas and arranged for him to come to the police station.

Thomas was charged and convicted of assault in the second degree. This appeal followed.

*Probable Cause Testimony*

Thomas contends the trial court erred in denying his motion for mistrial made after Detective Thorp gave testimony about his belief that he had probable cause to arrest Thomas.

An important fact bearing on this issue is that Detective Thorp was called as a defense witness. On direct examination, defense counsel introduced the topic of probable cause by eliciting the detective's testimony that he believed he had probable cause to arrest Thomas when he went to his residence on June 4.

Q. Now, at the time you went out on June 4th to the residence where Mr. Thomas was living, at that time you believed you had probable cause to arrest; am I wrong or right about that?
A. That is correct, I believed I had probable cause.
Q. All right. Now, in the meantime after that date, you did not contact this person?
A. Correct.
Q. Now, Mr. Thomas was arrested on what date?
A. He was arrested by a different officer, as a matter of fact, on— oh, gosh, I believe it was June 7th. Yes.
Q. And that other officer was who?
A. Officer Howard.
Q. All right. And that was it per your instructions?
A. Yes, I had completed a bulletin for Mr. Thomas. Officer Howard had seen that bulletin and that's when he contacted me and stated he knew the building manager and he set up a meeting with Mr. Thomas to show up at the North Precinct.
. . . .
Q. And what was the purpose of his coming to the North Precinct?
A. To obtain a statement from him, get his side of the story and make a determination from there what his future would be, whether he'd be placed in custody or not.
Q. But you had already decided there was probable cause to arrest?
A. That's correct.

On cross-examination, the prosecutor asked Thorp to clarify the basis for his finding of probable cause:

> Q. Now, when you had established that—you indicated that you had PC [probable cause], but for those of us less familiar with what that means, what does PC mean?
>
> A. PC is probable cause, and that is essentially authority to arrest a person. I believe criminal activity has occurred and I can arrest the suspect who conducted that criminal activity.
>
> . . . .
>
> Q. What is—in this case what was it that led you to believe that you had probable cause to arrest Mr. Thomas?
>
> A. It was a combination of Ms. Heller's statement both to the initial responding officer, her follow-up statement to me, and the photographic evidence. They all supported probable cause for assault.
>
> Q. Now, in order to make that determination in your training and experience, does a detective necessarily—or an officer necessarily had to have talked to a suspect in order to speak with them prior to making a probable cause determination?
>
> A. No, not at all.
>
> Q. And can you tell us why, or what do you mean by that?
>
> A. The facts can speak for themselves. Again, the photographs are facts. That shows that she was severely assaulted, and her statement—everyone else's statement that spoke with the responding officer, they were all consistent in naming Mr. Thomas as the individual who gave her those injuries. There was no—

At this point, defense counsel objected. The trial court sustained the objection and stated that probable cause is not the standard at trial. However, when Thomas later moved for a mistrial, the trial court denied the motion. Thomas contends the motion should have been granted because the detective's testimony about probable cause was an improper opinion on guilt.

The standard of review for denial of a motion for a mistrial is abuse of discretion. State v. Perez-Valdez, 172 Wn.2d 808, 858, 265 P.3d 853 (2011). A mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be tried fairly. State v. Weber, 99 Wn.2d 158, 165, 659 P.2d 1102 (1983).

4

An accused is guaranteed the right to a fair trial by an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 3, 21, 22. No witness may offer testimony in the form of an opinion regarding the guilt of the defendant. City of Seattle v. Heatley, 70 Wn. App. 573, 577, 854 P.2d 658 (1993), review denied, 123 Wn.2d 1011 (1994). Washington courts do not take an expansive view of claims that testimony constitutes an opinion of guilt. Heatley, 70 Wn. App. at 579.

We do not regard the detective's testimony as an improper opinion on guilt. Defense counsel opened up the subject of probable cause for strategic reasons. This opened the door for the State on cross-examination to clarify the meaning of probable cause and give appropriate context to the detective's testimony elicited by defense counsel on direct examination. See State v. Gefeller, 76 Wn.2d 449, 455-56, 458 P.2d 17 (1969). This was a different and far less prejudicial exploration of the meaning of probable cause than what occurred in State v. Stith, 71 Wn. App. 14, 22-23, 856 P.2d 415 (1993), a case Thomas has submitted as supplemental authority. There, defense counsel made an argument suggesting that police officers had fabricated their testimony, and the prosecutor responded by arguing that "'the question of probable cause is something the judge has already determined before the case came before you today.'" Stith, 71 Wn. App. at 17. Here, the officer merely gave straightforward answers to questions about police procedure.

Also cited by Thomas as supplemental authority is State v. Jones, 144 Wn. App. 284, 183 P.3d 307 (2008). There, the court stated that prosecutorial

5

misconduct would not be excused on the theory that defense counsel had opened the door to it. Jones, 144 Wn. App. at 295. Thomas argues that here, as in Jones, the State is improperly exploiting the "open door" rule. We disagree. What occurred here is not comparable to what happened in Jones. In Jones, defense counsel cross-examined an officer and elicited his testimony that the confidential informant had dropped out of sight. The State "seized the opportunity" to elicit "inadmissible and inflammatory hearsay evidence"—the officer's testimony that the informant was too frightened to testify even though he had previously appeared excited to do so. Jones, 144 Wn. App. at 295.

Here, unlike in Jones, the prosecutor's questions to the detective were within the scope of the colloquy between defense counsel and the detective, and the answers were not inflammatory. We reject Thomas' argument that the prosecutor had a duty to object when defense counsel introduced the irrelevant topic of probable cause. As the State points out, raising an objection carries the risk that the jury will believe the objecting party is trying to hide something. In light of the curative remarks made by the trial judge, there is no reason to believe the jury was misled into thinking that the detective's belief in probable cause satisfied the State's burden of proof.

Presenting testimony about probable cause is indeed an irregularity, and the trial court rightly chastised both counsel for their respective parts in it. Nevertheless, when viewed against the backdrop of all the evidence, the irregularity did not so prejudice the jury as to deny Thomas his right to a fair trial.

*Gun Testimony*

Thomas again moved for a mistrial, unsuccessfully, when Jennings testified that Thomas "had a gun," despite a pretrial ruling barring evidence that Thomas had or displayed a gun at the club on the night in question. Thomas argues on appeal that the reference to a gun was a serious irregularity that demanded a mistrial ruling.

On direct examination, the prosecutor asked Jennings how he reacted when he found Heller at the club with obvious injuries after her encounter with Thomas. Jennings responded that he wanted to "jump on him," but then he remembered that Thomas "had a gun":

> Q. So what did you do, what did you do when you saw this?
> A. . . . I didn't know what happened to her. I run to the back back there, at the back door. Mr. Thomas was still standing there in the back back there, and I run back there because I was going to jump on him. But I remembered he had a gun, so I figured that's what he hit her with was the gun.

Defense counsel immediately objected. The trial court sustained the objection, struck the answer, and instructed the jurors to disregard. Once the jury was excused, defense counsel moved for a mistrial. The trial court denied the motion.

The question is whether, in light of all the evidence, Jennings' testimony so prejudiced the jury that Thomas was denied a fair trial. We conclude it did not. The fact that a person *owns* a gun is not necessarily prejudicial. The trial court immediately struck Jennings' answer and instructed the jury to disregard it. The court emphasized to the jury that there was no evidence that Thomas

7

possessed a gun during this incident. Heller did not mention a gun in her testimony about being punched by Thomas in the back room.

Thomas relies on State v. Freeburg, 105 Wn. App. 492, 20 P.3d 984 (2001). This case is not like Freeburg. There, evidence of the defendant's possession of a weapon at the time of arrest was purposefully admitted to show flight and consciousness of guilt. No limiting instruction was given. Here, Jennings' speculation that Thomas might have had a gun with him was immediately struck from the record, and the court gave a curative instruction. The trial court did not abuse its discretion in denying defense counsel's motion for mistrial.

*Exclusion of Spears' Testimony*

Thomas contends that the trial court improperly curtailed his right to present a defense by excluding testimony suggesting that it was Heller who committed assault on the night in question.

On December 18, 2012, the last day of trial testimony, Spears was on the witness stand. During a break, Spears disclosed to defense counsel that she had received text messages from Heller a day or two after the incident, in which Heller said that she herself had punched Thomas on the night of the incident, one punch for each grandchild. Thomas wanted to use Spears' testimony about the text messages to impeach Heller who, in her earlier testimony, did not mention punching Thomas. The testimony was excluded because it was disclosed late. Thomas made an offer of proof:

> This was late-breaking evidence. . . . My understanding . . . is that Ms. Spears received a text message from her mother a day or two after the incident itself. She would have testified that Ms. Heller was calm in the beginning and then she became more and more upset, her behavior escalated, and then she would come in and say—and then she got loud. And then she would have testified that with every punch she said this is for [J.S.], the punch against Mr. Thomas, this is for [W.R.], this is for [J.M.], and this was out of Ms. Heller's own mouth. It would be of course impeachment evidence. I want to make sure I cover it all.
>
> . . . .
>
> . . . the court barred me from bringing that evidence out.

Under both the United States and Washington Constitutions, an accused has the right to a meaningful opportunity to present a complete defense. U.S. CONST. amends. 6, 14; WASH. CONST. art. I, § 22. These provisions require that an accused receive the opportunity to present his version of the facts to the jury. State v. Jones, 168 Wn.2d 713, 720-21, 230 P.3d 576 (2010).

This case is not like Jones or State v. Maupin, 128 Wn.2d 918, 913 P.2d 808 (1996), where the trial courts excluded the only evidence of the defendants' defense theories and in each case the evidence had high probative value. Here, another witness had already testified that he heard Heller admit to attacking Thomas when Thomas received a phone call from Heller, which he put on speakerphone. And Spears' testimony that Heller's text messages admitted punching Thomas would have only impeached Heller's testimony that she did not hit Thomas. Because it would not have impeached her testimony that Thomas hit her, it had low probative value for the defense. Thomas fails to establish that the exclusion of the last-minute testimony deprived him of the opportunity to offer a meaningful defense.

9

*Admission of Photographs*

Thomas argues that the court abused its discretion by admitting prejudicial photographs of Heller. Our review is for an abuse of discretion. State v. Crenshaw, 98 Wn.2d 789, 806, 659 P.2d 488 (1983).

Accurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect. Crenshaw, 98 Wn.2d at 806. The eight photos of Heller that were admitted were taken while she was lying in a hospital bed. They show facial swelling, two breaks to her nose, bleeding from her nose, and black eyes.

Thomas defended in part on the theory that Heller sustained the injuries when she fell after attacking him. Heller has epilepsy, and Thomas suggested she might have been having an epileptic seizure. The photos tended to refute Thomas' theory and to support, instead, the State's assertion that the injuries were caused by Thomas punching Heller repeatedly in the face. We find no abuse of discretion.

*Selection of Alternate Jurors*

Thomas contends that the court violated his right to a public trial by conducting the selection of alternate jurors in a manner that was not open to the public.

On December 19, 2012, before instructions were given to the jury and closing arguments were presented, the trial court conducted a process for deciding which two jurors would be designated as alternates. The record contains the following description of the process:

(JURY NOT PRESENT IN THE COURTROOM.)

THE COURT: We're going on the record. We made it on the record. We just did a random selection of little pieces of paper and the defense picked Juror No. 3 as the first alternate and the State picked Juror No. 4 as the second alternate. So they'll be dismissed with instructions at the end of closing. There's only one time I've ever had to call back an alternate, but you never know.[1]

A defendant's right to a public trial is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. State v. Strode, 167 Wn.2d 222, 225, 217 P.3d 310 (2009). To protect the defendant's right to a public trial, a trial court must analyze and weigh five factors before closing a portion of a criminal trial. State v. Bone-Club, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995). Thomas contends the record shows that "the drawing of alternate jurors was done during a court recess off the record without a Bone-Club inquiry," thus establishing a court closure which requires that his conviction be reversed and remanded for a new trial.

Thomas relies on State v. Jones, 175 Wn. App. 87, 303 P.3d 1084 (2013). In Jones, the court indicated at the close of evidence that a court clerk would randomly draw names of four jurors from a rotating cylinder to determine which jurors would be alternatives. There was a court recess during the defense closing arguments. The drawing occurred during the recess. The Jones court concluded that the procedure did not occur in open court and that the off-the-

---

[1] Report of Proceedings (Dec. 19, 2012) at 3.

record selection by the court clerk lacked safeguards against manipulation and chicanery:

> Although we do not suggest that the alternate juror drawing in this case was anything but random—and Jones does not appear to argue otherwise—there is simply no way to tell how the drawing was performed. The issue is not that the drawing in this case was a result of manipulation or chicanery on the part of the court staff member who performed the task, but that the drawing could have been. Where such a drawing occurs during a court recess off the record, the defendant and the public lack the assurance of a truly random drawing that they would have if the drawing were performed in open court on the record. This lack of assurance raises serious questions regarding the overall fairness of the trial and indicates that court personnel should be reminded of the importance of their duties. Accordingly, we conclude that considerations of logic "implicate the core values the public trial right serves." [State v. ]Sublett, 176 Wn.2d [58,] 72[, 292 P.3d 715 (2012)].

Jones, 175 Wn. App. at 102. The court concluded that the defendant was entitled to a new trial.

Here, unlike in Jones where the court clerk selected the alternates, the record reflects that the random selection was done by the parties' attorneys under the supervision of the judge. Although the jury was not present, the record provides no basis to believe that the drawing of names did not occur in an open courtroom where it could be witnessed by the public. Participation by counsel is an additional safeguard against manipulation and chicanery. We conclude that no closure occurred, a Bone-Club analysis was not required, and Thomas is not entitled to a new trial.

Affirmed.

12

WE CONCUR:

Becker, J.

_____

_____

_____