

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE APR 2 1 2016

CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on April 21, 2016

Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | No. 89321-7 |
| | ) | |
| v. | ) | |
| | ) | EN BANC |
| MARTIN ARTHUR JONES, | ) | |
| | ) | |
| Respondent. | ) | Filed: APR 2 1 2016 |
| | ) | |

YU, J.— This case presents questions regarding a defendant's public trial right and right to be present as applied to the designation of alternate jurors by a random drawing performed after both sides have rested at trial. The random drawing in this case was done by the trial court's judicial assistant at a brief recess during closing arguments. Defendant Martin Arthur Jones contends that this violated his constitutional rights to a public trial and to be present at all critical stages of trial proceedings.

Based on the specific facts presented by the record before us, we hold that the random drawing by the judicial assistant did not implicate Jones' public trial

right. We also hold that Jones waived his right-to-presence claim by failing to raise an objection until after the jury reached its verdict. We therefore affirm in part and reverse in part the Court of Appeals, and reinstate Jones' conviction.

## FACTUAL AND PROCEDURAL HISTORY

The facts underlying the offense are not at issue at this time. Briefly, Jones' wife was pulled over for speeding and, based on her performance in field sobriety tests, she was arrested for driving under the influence. While one state trooper took Jones' wife into custody, another stayed at the scene to process the vehicle for towing. A white male approached the trooper at the scene and shot him in the back of the head. Remarkably, the trooper survived and identified Jones as the shooter. Based on the trooper's identification and other evidence, Jones was charged in Pacific County with attempted first degree murder. The trial was ultimately held in Pierce County. *State v. Jones*, 175 Wn. App. 87, 91-94, 303 P.3d 1084 (2013).

The question of how the alternate jurors would be designated came up early and often in the Pierce County proceedings. The question was first raised by the court during pretrial motions. The court offered Jones a choice for how to designate the alternates: "If we are not going to tell [the jurors which of them are alternates], then it's random and we pull it out of the rotating cylinder, and it's whoever is left is who is eligible to be selected out. Otherwise, it's your last four." 1 Verbatim Report of Proceedings (VRP) at 35 (Oct. 15, 2010). The court invited

2

the attorneys to discuss it among themselves and specifically to "[c]hat with Mr. Jones, see what he prefers." *Id.* at 36. The court made it clear that "defense really controls on that. It's either random, or it's the last four." *Id.*

The court later revisited the issue of designating alternates, reiterating that the "defense drives the bus on this." *Id.* at 126 (Jan. 3, 2011). In response to questions raised by Jones' attorney, the court noted that "[t]he box is back there in the corner. It's really not -- it's . . . spinning and the numbers are all in there if we still have 16." *Id.* at 127. Ultimately, Jones chose the random drawing as his preferred method for designating alternates.

A panel of 100 jurors was summoned to appear. Voir dire occurred on the record in open court over the course of two days. The jurors were informed during voir dire that 4 of the seated jurors would be alternates. At the end of voir dire, the attorneys conducted their peremptory challenges on paper at counsel table in open court. Jones does not contend that any part of the pretrial jury selection proceedings violated his public trial right or right to presence.

The jury trial began with opening statements, and the parties both rested four weeks later. When the court asked if the jurors had any questions, one asked about the designation of alternates: "[j]ust out of curiosity, you said there would be the 12 jurors. Do we know or are we supposed to know how that will happen?" 23

VRP at 3807-08 (Feb. 15, 2011). The court reviewed the process that it would use to designate alternates:

> As I explained back in early January we seated 16 in case there was a family emergency, or some unforeseen event that would occur that would require a juror to be excused. There are still 16 of you here in the box today near the end of the trial.
>
> It will be random. The box to be spun looks a little like an old fashioned bingo, but it's wooden. [The judicial assistant] has all 16 of your juror numbers, and after all of the closing arguments she will tell me which four numbers have been selected at random. We don't know now. We are still hoping that there is no unexpected emergency between now and Thursday morning, but that's still a possibility.
>
> The four jurors that are not selected to deliberate will not be excused because during deliberations one of the 12 might have an emergency that would require them to be excused, so we will still have four jurors available to resume deliberations with the other jurors if that's required.

*Id.* at 3808.

After the parties rested and before closing arguments, there was a one-day break for the jurors during which the parties addressed various matters including the jury instructions and the closing argument schedule. Both sides anticipated making lengthy closing arguments, so the court was careful to figure out a schedule that would include sufficient breaks for the jurors without disrupting the flow of each side's closing arguments. The court planned to give the jurors a 15-minute break in the middle of the morning, a 90-minute lunch break, and another short break in the middle of the afternoon. 24 VRP at 3854-55 (Feb. 16, 2011).

Neither party expressed any concerns about the court's proposed schedule. The next day, the court reviewed the schedule again with all of the attorneys and Jones, again without anyone expressing any confusion, surprise, or objections.

The proceedings closely followed the court's schedule. After the State presented its closing argument, Jones' counsel began his at 11:34 a.m. Suppl. Clerk's Papers (CP) at 1429. At noon, the court announced it would recess for lunch and instructed the jurors to return to the deliberation room by 1:15 p.m.; Jones resumed his closing argument at 1:38 p.m. *Id.*

At 2:55 p.m., the court announced that "[w]e are going to have to take o[u]r afternoon break." 25 VRP at 4017 (Feb. 17, 2011); *see also* Suppl. CP at 1429. The court instructed the jury to "step on into the jury deliberation room. Leave you[r] notebooks and your jury instructions here, and because we are only [g]oing to take a ten-minute break, I would ask that you not go out." 25 VRP at 4018 (Feb. 17, 2011). Then, "outside the presence of the jury," the court advised Jones' attorneys that it would "need you back in five minutes . . . [to] discuss with [the State's attorneys] the hour that we have left." *Id.* While the record shows the court was in recess from 2:55 to 3:03 p.m., Suppl. CP at 1429, it does not indicate that anyone other than the jurors was instructed to leave the courtroom during the recess and it does not indicate whether or not there was anyone in the courtroom during the recess.

At 3:05 p.m., the jury was reseated and Jones resumed his closing argument, followed by the State's rebuttal. *Id.* at 1429-30. After the State concluded, the court announced on the record in open court which jurors were designated as alternates:

> All right ladies and gentlemen. We talked about it yesterday, we talked about it in January. At the outset of this trial we seated four alternates. I think the attorneys and I are as surprised as everyone else that there are still 16 of you in the box. But at this time at the break at 3:00, four jurors['] number[s] were pulled randomly, and at this time I am temporarily excusing these four jurors: The order in which I am excusing you is important because if during the deliberations of the other 12 jurors one of the jurors has to be excused, the first juror that is temporarily excused is what we are calling juror No. 16, Mr. Power. I am excusing you as an alternate at this point, but you would be the first one called back in the event one of the other 12 has to be excused for some emergency or for some reason.
>
> The second alternate selected out Juror No. 9, Mr. White[,] is temporarily excused. Mr. Gama, Juror No. 5[,] is temporarily excused, and Ms. Engel, Juror No. 11[,] is temporarily excused.
>
> In temporarily excusing you, what that means is that you are not fully released from this case.

25 VRP at 4061-62 (Feb. 17, 2011). There is no indication that anyone expressed any surprise, confusion, or objections when the court announced that the alternates had been designated by a random drawing conducted during the midafternoon break.

The court then asked the alternate jurors "to step on into the jury deliberation room with [the judicial assistant] for just a few moments while I talk with the other

6

jurors." *Id.* at 4063. The court gave the remaining jurors instructions for their deliberations and then told them to "go ahead and step on into the jury deliberation room." *Id.* at 4067. Once "outside the presence of the jury," the court announced, "I am going to let the four jurors leave now." *Id.* There is no indication that anyone objected to releasing the four alternates for the day.

The jury deliberated over the course of three business days, from Friday, February 18 through the following Wednesday, February 23 with an intervening holiday. The jurors submitted several questions while they were deliberating, and attorneys for both sides participated in answering those questions. Throughout the course of deliberations, Jones raised no concerns about the composition of the deliberating jury. Jones was convicted of attempted murder in the first degree, and the jury found by special verdicts that Jones was armed with a firearm and that the victim was a law enforcement officer who was performing his official duties.

Approximately one week after the jury returned its verdicts, Jones filed a motion for a new trial, contending, among other things, that designating alternate jurors by conducting a random drawing at a recess during the closing arguments violated his public trial right and right to presence. The court denied Jones' motion for a new trial and imposed an exceptional sentence above the standard range of 600 months of total confinement, to be followed by 36 months of community custody. Jones appealed.

The Court of Appeals filed a partially published opinion holding that Jones' public trial right was violated "when, during a court recess off the record, the trial court clerk drew four juror names to determine which jurors would serve as alternates," and that this was structural error requiring reversal. *Jones*, 175 Wn. App. at 91. However, the Court of Appeals held that Jones' right to be present was not violated and even if it was, any error was harmless. *Id.* at 104. The Court of Appeals rejected Jones' arguments regarding the admissibility of certain evidence, and various grounds that Jones raised in his pro se statement of additional grounds for review. *State v. Jones*, No. 41902-5-II, slip op. (unpublished portion) at 18-34 (Wash. Ct. App. June 4, 2013).

The State filed a petition for review regarding Jones' public trial right. Jones filed a cross petition for review regarding his right-to-presence claim and certain evidentiary issues. This court stayed consideration of the petitions pending *State v. Njonge*, 181 Wn.2d 546, 334 P.3d 1068 (2014), *State v. Slert*, 181 Wn.2d 598, 334 P.3d 1088 (2014) (plurality opinion), and *State v. Love*, 183 Wn.2d 598, 354 P.3d 841 (2015). After the stays were lifted, we granted the State's petition for review and granted Jones' cross petition only on the right-to-presence issue. 184 Wn.2d 1018 (2015).

ISSUES

A.     Was Jones' public trial right implicated by the judicial assistant's act of randomly drawing the alternate jurors?

B.     Should Jones' conviction be reversed due to the alleged violation of his right to be present at the random drawing to designate alternate jurors?

ANALYSIS

A.     Based on the record before us, there was no public trial violation

The right to an open public trial is guaranteed by article I, sections 10 and 22 of the Washington State Constitution. Whether a defendant's public trial right has been violated is a legal issue, subject to de novo review. *Love*, 183 Wn.2d at 604. We apply the experience and logic test to determine whether the public trial right is implicated by a particular proceeding. *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012) (C. Johnson, J., lead opinion). In doing so, we must take care to define the proceeding at issue with precision because our focus is on the proceeding that actually occurred, not on the general label that might be attached to a variety of related proceedings. *Id.* at 72-73. The actual proceeding at issue here was of an extraordinarily limited nature.

The overwhelming majority of proceedings relating to the designation of alternate jurors (including the court's offering of options for designating alternates and giving the choice to Jones, the attorneys' questions to the court about those options, the court's repeated explanations of how the random drawing would

proceed, and the court's announcement of which jurors had been drawn) occurred on the record in open court. The only event that did not occur in open court was the judicial assistant's physical act of randomly drawing the alternate jurors according to the agreed-on procedure. We thus limit our analysis to that particular event, and, based on the specific facts in the record presented, hold that it did not implicate Jones' right to a public trial.[1]

1.    Experience

It is Jones' burden to show, as a matter of experience, that a random drawing to designate which of the seated jurors will serve as alternates has "'historically been open to the press and general public.'" *Id.* at 73 (quoting *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (*Press* II)). Jones contends that "selection of alternate jurors is typically part of *voir dire* which has traditionally been conducted in open court." Answer & Cross-Pet. for Review at 4; *see also* Suppl. Br. of Martin Jones at 10. Assuming that proposition is true, it does not answer the narrow question presented here.[2]

---

[1] As a general matter, a recess is not an open court proceeding, and conducting certain tasks related to the designation of alternate jurors (or other aspects of jury selection) during a court recess could implicate a host of issues. In this case, however, as a matter of experience and logic, we hold that the random drawing to designate alternate jurors simply did not implicate the public trial right.

[2] We do note, however, that designating alternate jurors by conducting a random drawing after parties have rested, rather than during pretrial voir dire, is not a practice unique to the court that conducted Jones' trial. *See, e.g.*, *United States v. Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007) (noting "the logic of this practice and its vintage in the district court," though discouraging its use as inconsistent with Fed. R. Crim. P. 24); *People v. Van Camp*, 356 Mich. 593, 97

There are certainly tasks related to the jury selection and voir dire process that we have held may be done outside of open court without running afoul of the public trial right. *See State v. Russell*, 183 Wn.2d 720, 729, 357 P.3d 38 (2015) (work sessions to review juror questionnaires for hardship excusals); *Slert*, 181 Wn.2d at 605-06 (González, J., lead opinion) (reviewing jury questionnaires prior to voir dire), 614 (Stephens, J., dissenting) (administrative excusal of individuals from the jury pool due to illness); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013) (lining up and seating the venire in numerical order before unlocking the courtroom); *State v. Beskurt*, 176 Wn.2d 441, 447, 293 P.3d 1159 (2013) (C. Johnson, J., lead opinion) (juror questionnaires used by the attorneys as a "'screening tool'" for voir dire conducted in open court could be sealed without implicating defendant's public trial right).

There are also statutes and court rules providing that court clerks and judges may perform ministerial tasks related to jury selection generally and voir dire specifically.[3] *See, e.g.*, RCW 2.36.063 ("The judge or judges of the superior court

---

N.W.2d 726, 732 (1959) (applying a Michigan statute that required alternate jurors to be selected by random drawing at the close of a case); JEFFERSON COUNTY SUPER. CT. LOCAL CIV. R. 38.3 ("The alternate juror shall be designated by random drawing to be announced after closing argument."); OKANOGAN COUNTY SUPER. CT. LOCAL R. 47(b) ("[T]he parties may stipulate that the alternate juror be designated by random drawing to be announced after closing argument.").

[3] While we do not suggest that a statute or court rule can ever abridge a constitutional right, they can shed light on whether particular proceedings have historically been open to the press and general public. *See Sublett*, 176 Wn.2d at 75-77 (C. Johnson, J., lead opinion) (considering court rules in analyzing the experience prong as pertaining to jury instructions and questions from the jury during deliberations).

of any county may employ a properly programmed electronic data processing system or device to compile the jury source list, and to compile the master jury list and to randomly select jurors from the master jury list."); CrR 6.3 ("When the action is called for trial, the jurors shall be selected at random from the jurors summoned who have appeared and have not been excused."), 6.5 ("If at any time before submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury."). Jones does not argue, and we can find no indication, that these tasks have traditionally been performed in open court.

Thus, whether a specific task could generally be considered part of voir dire is not dispositive. Jones has not provided any historical or legal resources showing that the press and general public have traditionally been able to observe the specific, nondiscretionary, ministerial task of physically drawing the alternate jurors according to a procedure chosen by the defendant that was described both before and after the fact on the record in open court. The experience prong is not met.

2.    Logic

To satisfy the logic prong, Jones must show that "'public access plays a significant positive role in the functioning of the particular process in question.'"

12

*Sublett*, 176 Wn.2d at 73 (C. Johnson, J., lead opinion) (quoting *Press* II, 478 U.S. at 8). In analyzing this prong, we look to whether openness will advance the purposes of the public trial right: "to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." *Id.* at 72. Concerns relating to witnesses and perjury are not implicated here, so we consider only the purposes of ensuring a fair trial and reminding the court of its responsibility to Jones and the importance of its functions. Jones argues that the random drawing here frustrated those purposes because real-time public oversight would have been "[t]he only assurance that [the random drawing] process was done fairly." Suppl. Br. of Martin Jones at 12.

Jones' argument overlooks several key facts in the record. The deliberating and alternate jurors were all chosen by the same voir dire process in open court. The method for drawing the alternates, the box from which the alternates would be drawn, and the judicial assistant who would be doing the drawing were all identified on the record in open court. Jones himself chose the random drawing method for designating alternates, and (as discussed further below) Jones had the opportunity to object to the drawing if he was concerned about how it was conducted. In light of all these proceedings on the record in open court, public oversight at the moment the judicial assistant actually drew the pieces of paper

designating the alternate jurors would not play a significant positive role in the functioning of the drawing itself, and it would not advance the purposes underlying the public trial right.

These facts also easily distinguish this case from *State v. Rouner*, 333 Mo. 1236, 64 S.W.2d 916 (1933), which Jones cites to demonstrate "[t]he importance of transparency in the act of selecting jurors by wheel as used here." Suppl. Br. of Martin Jones at 12 n.2. The jury selection at issue in *Rouner* was actually the compilation of the entire jury panel for a session of a Missouri county court, not the designation of alternates. *Rouner*, 64 S.W.2d at 918. The Missouri Supreme Court noted the "evils" of a prior "uncontrolled system" wherein the jury panel was selected by the sheriff, who apparently had unlimited discretion in how to complete that task. *Id.* To bring some control and oversight to the process, Missouri statutes were amended to provide that the jury panel must be compiled by the county clerk in open court. *Id.* The defendant in *Rouner* did not know until after he was convicted that the jury panel from which his trial jury was selected had been compiled by two judges in a closed room. *Id.* at 916. In Jones' case, by contrast, all 16 of the seated jurors were chosen by voir dire in open court, the judicial assistant had no discretion in how to carry out the drawing, there is no indication the drawing was conducted by an unauthorized person, and Jones knew about it well before he was convicted.

Finally, it is difficult to imagine where the logical limit of Jones' line of reasoning would be. For instance, if Jones had chosen to designate the alternate jurors based on their juror numbers, would he now be arguing that a public trial violation occurred because the initial assignment of juror numbers was not done in open court? And what if the court were to use a computer program to randomly designate alternates? Jones indicated at oral argument that courts should simply avoid using such technology. Wash. Supreme Court oral argument, *State v. Jones*, No. 89321-7 (Feb. 23, 2016), at 19 min., 52 sec. to 20 min., 14 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. We do not agree with the idea that the public trial right prohibits courts from making reasonable use of technological advancements that increase efficiency, decrease costs, and promote the timely and evenhanded administration of justice. And there is no meaningful distinction between the physical act of randomly drawing alternates and the physical act of pressing a button to run a computer program that randomly designates alternates.

Neither experience nor logic indicates that the public trial right was implicated by the judicial assistant's randomly drawing the alternate jurors in this case. We thus conclude that there was no violation of Jones' right to a public trial.

B.    Jones waived his right-to-presence claim

As a matter of due process, "[a] criminal defendant has a fundamental right to be present at all critical stages of a trial." *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). Jones claims that this right was violated when the judicial assistant conducted the random drawing to designate the alternate jurors outside his presence. Assuming (without deciding) that the drawing was a critical stage of Jones' trial, and further assuming (without deciding) that Jones was not present for the drawing, we hold he waived this error by failing to raise a timely objection.

Jones first raised his right-to-presence argument in a motion for a new trial pursuant to CrR 7.5(a)(5), which he filed days after the jury convicted him. CP at 1286, 1299. A motion for a new trial is not a substitute for raising a timely objection that could have completely cured the error. *See, e.g.*, *State v. Elmore*, 139 Wn.2d 250, 277-78, 985 P.2d 289 (1999); *State v. Williams*, 96 Wn.2d 215, 225-26, 634 P.2d 868 (1981). Indeed, the failure to raise a timely objection strongly indicates that the party did not perceive any prejudicial error until after receiving an unfavorable verdict. *Williams*, 96 Wn.2d at 226.

Jones unquestionably had ample opportunity to object to the designation of alternates in time to completely cure the error. The jury's deliberations extended over multiple days, and Jones and his attorneys actually participated in responding to jury questions during deliberations. *See* Suppl. CP at 1430. If Jones had

objected at any time during deliberations, the random drawing could have been redone in his presence and, if the results were different, the previously dismissed alternates could have been recalled and deliberations begun anew. *See* 25 VRP at 4061-62 (Feb. 17, 2011); *cf. Williams*, 96 Wn.2d at 226 ("Even after all the testimony was concluded and the jury was in the process of deliberating, petitioner declined to move for a mistrial when a sick juror was excused."). Jones does not point to anything that prevented him from making a timely objection, and he does not explain how such an objection, if granted, would have been an incomplete remedy.

Based on the record presented, we must conclude that "[t]he defense made a tactical decision to proceed, 'gambled on the verdict', lost, and thereafter asserted the previously available ground as reason for a new trial. This is impermissible." *Williams*, 96 Wn.2d at 226 (citing *Nelson v. Martinson*, 52 Wn.2d 684, 689-90, 328 P.2d 703 (1958)). We therefore hold that Jones waived his right-to-presence challenge and decline to address its merits.

## CONCLUSION

Based on the specific facts presented by the record before us in this particular case, we hold that the public trial right was not implicated by the random drawing for alternate jurors by the judicial assistant. We also hold Jones waived his right-to-presence claim by failing to raise a timely objection. While it might be

the best practice to conduct such a drawing in the presence of the defendant and the public, it is not constitutionally required. We therefore affirm in part and reverse in part the Court of Appeals and reinstate Jones' conviction.

_____
Yu, J.

WE CONCUR:

_____
Madsen, C.J.

_____
[signature]

_____
Owens, J.

_____
Fairhurst, J.

_____
Stephens, J.

_____
González, J.

_____

_____
Korsmo, J.P.T.

No. 89321-7

GORDON McCLOUD, J. (concurring)—I agree with the majority that defendant Martin Jones has no right to presence or open courtroom proceedings during the random drawing of alternates in the context of this case. Thus, there was no constitutional problem with the judicial assistant conducting that work during a recess from the court proceedings.

But that is the only thing that we need to say to decide this case. I therefore disagree with the majority's decision to go on to state that Jones waived any possible right-to-presence claim by failing to raise it sooner. Majority at 15-17. I also disagree with the majority's analysis of that waiver issue. We have held that for a defendant's waiver of the right to presence to be constitutional, it must be "both knowing and voluntary." *State v. Rice*, 110 Wn.2d 577, 619, 757 P.2d 889 (1988) (citing *United States v. Tortora*, 464 F.2d 1202, 1208 (2d Cir. 1972)). We have acknowledged that a knowing and voluntary waiver of this constitutional right to presence can be "express or implied," and that it can be "implied" when a defendant

1

"voluntarily absent[s] himself from the proceedings." *Id.* (citing *Taylor v. United States*, 414 U.S. 17, 19-20, 94 S. Ct. 194, 38 L. Ed. 2d 174 (1973) (per curiam)). We have even developed a framework for determining, under a totality of circumstances, whether a defendant's absence from a proceeding is voluntary or not. *See State v. Thomson*, 123 Wn.2d 877, 881, 872 P.2d 1097 (1994). But I can't find any prior case from this court holding that a defendant knowingly and voluntarily waived his or her right to presence when he or she didn't even know a proceeding was occurring because it happened during a recess, meaning during a time when court is not in session.

Instead, I would hold only that the random drawing of alternates by a previously approved process was not an event to which the right to presence attached. Just as there is no constitutional right to an open courtroom or presence for a bailiff's or judicial assistant's computer work, there is no constitutional right to an open courtroom or presence during this preapproved, random drawing, work, either. I therefore respectfully concur.

2

George McCloud, Jr.