

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39499-9-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 39500-6-III) |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| SHAUN AARON SCHLENKER, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Each division of this court has issued a decision addressing whether a videoconference appearance from the jail of the accused violated the constitutional right to assistance of counsel because of a difficulty in communicating secretly with counsel during hearings. Each decision has turned on its unique facts. We add to the reservoir of Washington law on this subject matter. Because appellant Shaun Aaron Schlenker objected to remote appearances at pretrial hearings and complained about the inability to speak in private with his counsel, and because the superior court failed to afford facilities to Schlenker that enabled him to converse confidentially with his counsel, we hold that the pretrial procedures breached Schlenker's constitutional right. Because the State does not show constitutional harmless error, let alone argue harmless

error, we reverse all of Schlenker's five convictions.  We reverse one conviction with prejudice because of insufficient evidence.

FACTS

This appeal arises from Shaun Aaron Schlenker's Kristallnacht on Valentine's Day 2021.  Schlenker loves his guns.  Angered by the confiscation, by the Long Beach Police Department, of his worshipped weapons, Schlenker smashed windows of police cars and business buildings.

In September 2020, Long Beach Police Department officers arrested Shaun Aaron Schlenker, after he became inebriated.  Law enforcement involuntarily hospitalized Schlenker.  While undergoing treatment to address his intoxication and mental health problems, Schlenker uttered threats to medical staff, law enforcement officers, and attorneys.  Medical staff alerted Long Beach Police Department Deputy Chief Casey Meling of the threats.  Deputy Chief Meling filed for an extreme risk protection order on the ground that Schlenker's possession of firearms posed a significant threat to himself and others.  The court granted the order and directed Schlenker to surrender all guns.  Thereafter, according to Meling, Schlenker grew increasingly angry at the city police department.

Beginning in January 2021, Shaun Aaron Schlenker falsely reported to assorted law enforcement agencies that Deputy Chief Casey Meling burglarized Schlenker's home and stole his firearms. Displeased that law enforcement launched no investigation into his claims, Schlenker, on February 1, 2021, began a series of calls that extended for days to 911 operators to complain.

On February 14, 2021, an intoxicated Shaun Aaron Schlenker called the dispatcher at the Pacific County 911 call center. Schlenker addressed the 911 operator as "the same bitch that hangs up on me every fucking God-damned time." Report of Proceedings (RP) at 320. Schlenker demanded:

> Have the fucking sheriff—head sheriff of Pacific County come knock on my fucking door so I can knock his fucking teeth out. That's [indiscernible] I swear to God, have him come knock on my door, we'll have a conversation that he doesn't deserve, and if doesn't do what he needs to do, I'll knock his fucking teeth out.
> Bring—bring 10 officers, bring 20 officers, because I don't know what it's going to fucking take for all you little pussies to fucking do something. Okay? You got it?

RP at 322.

The Pacific County 911 center logged over twenty phone calls from Shaun Schlenker on the night of February 14, 2021. During one call, Schlenker commented:

> They took my firearms and other things, and lying when I was in the hospital. They ransacked my trailer.

3

RP at 327-28.  He abruptly ended his last call:

> I'm going to fuck some people up.  Thank you.  I'm done.  I'm fucking done.

RP at 328.

After Shaun Aaron Schlenker's last call to 911 dispatch, he walked along Long Beach's Pacific Avenue and smashed, with a baseball bat, windows at the Elks Lodge, the Performing Arts Center, Anchor Realty, and the Police Department headquarters.  At trial, the owner of the Performing Arts Center, William Svendsen, testified that the cost to repair the damage to the center amounted to $1,200.  The secretary for the Elks Lodge testified to the club's damage exceeding $8,000.  In its respondent's brief, the State cites to no trial testimony that established the amount of the damage to Anchor Realty's property.

On the night of February 14, Shaun Aaron Schlenker moved from downtown businesses to Long Beach Police Officer Miranda Estrada's residence, where he bashed Estrada's GMC Denali headlight and her Chevy Camaro back window.  Officer Estrada awoke to glass explosions.  She espied, through window blinds, Schlenker, with a baseball bat, smashing the lights and windows of her patrol car and personal vehicles. Estrada identified Schlenker, despite his dark attire, by a distinct beanie he wore.  Based

4

on previous interaction with Schlenker, Estrada knew he wore a beanie with frills on top. She swiftly called 911.

Deputy Chief Casey Meling responded to the commotion outside of Officer Miranda Estrada's home. Meling drew his taser, ordered Shaun Aaron Schlenker to drop the bat, and commanded him to lay on the ground. Officers Anthony Natsiopoulos, Flint Wright, and Miranda Estrada approached Schlenker with pistols. Schlenker relented, and officers handcuffed him. He remained angry and belligerent and reeked of alcohol. While being wrestled to the back of Officer Natsiopoulos' patrol car, Schlenker, according to Officer Estrada, uttered nonsensical remarks.

While riding in the back of the patrol car to the county jail, Shaun Aaron Schlenker banged his head against the car window. Schlenker threatened to strangle Officer Anthony Natsiopoulos and to kill his nonexistent children.

PROCEDURE

The State of Washington charged Shaun Schlenker with five crimes: count I - first-degree malicious mischief for damaging Officer Estrada's patrol car; count II - second-degree malicious mischief for $750 or more worth of damage to the Long Beach Performing Arts Center, The Elks Lodge, and Anchor Realty; count III - felony harassment for threats against Officer Anthony Natsiopoulos; count IV - third-degree

5

malicious mischief for damaging Officer Miranda Estrada's personal vehicles; and count

V - resisting arrest.  Count II of the amended information alleged:

> The defendant, SHAUN AARON SCHLENKER, on or about February 14, 2021, in the State of Washington, did knowingly and maliciously cause physical damage, in excess of $750, to property belonging to Long Beach Performing Arts Center, The Elks Lodge, *and* Anchor Realty; in violation of RCW 9A.48.080(1)(a).

Clerk's Papers (CP) at 33 (emphasis added).

During the COVID-19 pandemic, the Pacific County Superior Court implemented

emergency safety measures to safeguard public health.  *In the Matter of the Response by*

*Washington State Courts to the Public Health Emergency in Washington State,*

Administrative Order No. 2021-2 (Pacific County Superior Court, Feb. 1, 2021).  One of

the public health measures required Shaun Aaron Schlenker to attend most pretrial

hearings remotely, via Zoom from jail, while his attorney either made a physical

appearance in the courtroom or participated through video from a separate location.

These 2021 remote appearance proceedings included a February 16 preliminary

appearance and bail setting, March 5 competency report hearing, March 12 arraignment,

competency hearing, and bail hearing, March 26 hearing allowing defense counsel to

withdraw and setting bail, April 2 review and trial scheduling hearing, April 16 pretrial

scheduling hearing, May 7 speedy trial waiver hearing and bail setting, June 18 hearing

allowing defense counsel to withdraw, July 9 hearing regarding scheduling trial date with

new counsel, July 23 hearing waiving speedy trial, August 6 hearing to schedule

argument on defendant's pro se motions, August 20 hearing with new counsel appointed

and resetting trial dates, and a September 3 hearing allowing defense counsel to withdraw

and resetting speedy trial date.

During the pretrial hearings, Shaun Aaron Schlenker periodically complained that

he could not communicate privately with his lawyers. During a March 12 competency

hearing, Schlenker asserted that the government was:

> violating my attorney-client confidentiality privileges with their
> chosen method of conducting courtroom proceedings with Zoom video
> conferencing. I am unable to speak to my attorney during these conferences
> . . . and I feel that is a violation of my rights, since I'm not in the courtroom
> or we're not together and there's no way to do that through this
> conferencing, while the—everybody in the community, worldwide web, and
> it's being broadcasted, and in the courtroom, can hear what I say whenever I
> say it, and I can't speak to my attorney.

RP at 576-77. In response, the superior court commented:

> All right. Well, Mr. Schlenker, the Court does find that the
> accommodations we're making due to the COVID virus are authorized by
> both the Supreme Court and this Court's own inherent authority to operate
> its courtroom. I am unaware of any issues, as far as not being allowed to
> have private conversations with your attorney, Mr. Karlsvik. *If there is an
> issue, you can immediately bring it to the—excuse me—to the knowledge of
> the court.*
> So, the appearance itself may be public, sir, but *this is an open
> courtroom so this is not a place for private conversations. But that does not*

7

> *mean that there are not other opportunities to have private conversation*
> *with counsel.*

RP at 577 (emphasis added). The superior court adopted no rules and provided no

guidance to Schlenker on private communications with counsel.

At a March 21, 2021 hearing, defense counsel asked the court for permission to

withdraw and for the superior court to appoint new counsel. At the commencement of the

hearing, Shaun Aaron Schlenker intoned:

> Yes, Your Honor, before we begin, Your Honor, I have a problem
> with the way the hearing is being conducted again. I don't get to face my
> accuser. There's no camera on the District Attorney. All I can hear is her
> voice, so I think that I should be able to see my accusers in this; but, maybe
> I'm wrong on my rights.

RP at 580. The trial court responded:

> All right, sir, well, I'll interpret that as a motion and on [sic]
> objection to today's hearing. I will deny the motion to carry the hearing and
> we'll go forward.

RP at 580. The superior court granted counsel's request to withdraw and appointed a new

attorney. The court warned Schlenker, however, that he would likely not be allowed a

third attorney. During the March 21 hearing, Schlenker, without assistance from counsel,

asked for a reduction in bail, which request the court denied.

During trial, Shaun Aaron Schlenker admitted to drinking and walking through

town with his baseball bat. Schlenker testified:

8

> I was just very frustrated with the whole systems—just life in general, and ending up being in the position that I'm in.

RP at 379.

During trial, Officer Anthony Natsiopoulos and Deputy Chief Casey Meling testified that alcohol probably impacted Shaun Aaron Schlenker's decision-making on the night of February 14. Based on Schlenker's and the officers' testimony, the defense requested a jury instruction on voluntary intoxication. The trial court rejected the request. The court remarked:

> We have the Defendant's testimony that he was drinking; we have the officers' observation that they smelled some alcohol. So, there is some evidence of drinking. We don't have evidence of intoxication.

RP at 434. The superior court concluded that the evidence did not demonstrate that intoxication affected Schlenker's capacity to form the mental state necessary for the charged offenses.

After the state rested, Schlenker moved to dismiss count II while arguing that the State never established that he damaged all three businesses. The trial court denied the motion, while reasoning that evidence of harm to any one of the properties sufficed to find Schlenker guilty of the one count. Schlenker moved again to dismiss count II, after the state's rebuttal presentation, but the court once again refused.

9

In jury instruction 9, the superior court instructed the jury in part with regard to count II:

> To convict the defendant of the crime of malicious mischief in the second degree, in Count II, each of the following three elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about February 14, 2021, the defendant caused physical damage to the property of Long Beach Performing Art Center, The Elks Lodge, and Anchor Realty in an amount exceeding $750;
> (2) That the defendant acted knowingly and maliciously; and
> (3) That this act occurred in the State of Washington.

CP at 77. During deliberations, the jury asked the question: whether convicting Schlenker required that "all identified locations be damaged or only that some of the identified locations are damaged in excess of $750.00?" CP at 98. To avoid commenting on the evidence, the court directed the jury to consult their instructions and continue to deliberate.

The jury declared Shaun Aaron Schlenker guilty on all five counts. The superior court sentenced him to 90 days in jail, with credit for time served, and nine months of community supervision. The court also ordered Schlenker to pay for the cost of community supervision even though the court previously declared that he lacked the ability to pay discretionary legal obligations.

During the restitution hearing, the State sought payment of $7,942.37 in reimbursement for damage to the Long Beach Police Department's headquarters. The

10

State emphasized Shaun Aaron Schlenker's threat to the 911 operator: "I'm going to start with—I'm going to start with the local police, and I have a plan, because I know where you all live." RP at 322. During its oral ruling, the superior court denied any restitution for damage to the police building on the ground that the State did not charge Schlenker with damage to the headquarters and provided no proof of any damages. Nevertheless, the order of restitution reads that Schlenker must pay $9,733.88 to Washington Cities Insurance for damaging the Long Beach Police Department's headquarters.

The State's evidence seeking restitution also included an email from Bill Svendsen, an agent of the Performing Arts Center, detailing the cost for plywood and replacement glass for the center's building to be $1,190.96. The restitution order directed Shaun Aaron Schlenker to pay Anchor Realty $1,190.96 despite the State presenting no evidence of damage to Anchor Realty's building during trial.

## LAW AND ANALYSIS

On appeal, Shaun Aaron Schlenker assigns ten errors to the superior court's rulings and the conduct of his case. First, the superior court violated his constitutional right to privately confer with counsel at critical stages of the criminal prosecution. Second, insufficient evidence supported a conviction for count II, second degree malicious mischief. Third, the superior court committed error when refusing him a

11

voluntary intoxication instruction. Fourth, his counsel performed ineffectively when asking for the voluntary intoxication instruction with respect only to the malicious mischief counts and not all five charges. Fifth, the amended information charging count II was constitutionally deficient because it failed to plead an essential element of the crime. Sixth, the superior court erred when imposing $9,733.88 in restitution for damage to the Long Beach Police Department building when the State never charged Schlenker with a crime pertaining to damaging the building. Seventh, the trial court erred in imposing $1,190.96 in restitution to Anchor Realty when no evidence presented at trial or the restitution hearing pertained to any loss suffered by Anchor Realty. Eighth, the superior court erred in imposing community custody supervision fees. Ninth, the superior court erred when imposing a victim penalty assessment. Tenth, the superior court erred when assessing a DNA collection fee.

We agree with Shaun Aaron Schlenker's first and second assignments of error. When analyzing the first assignment of error, we divide our examination between resolving whether the videoconference arrangement violated Schlenker's constitutional rights and whether any violation demands reversal of convictions. Because we grant the first assignment, we need not and do not address assignments of error three through ten. We must still address assignment of error two because our agreement with Schlenker's

contention would require a dismissal with prejudice of the charge, not simply a reversal and remand for new trial. On remand, the superior court should again entertain any request for a voluntary intoxication instruction based on the evidence presented at a retrial.

Videoconference Appearances

Shaun Aaron Schlenker assigns error to his participating in pretrial hearings by video conference from jail while his counsel participated from the courtroom or also by Zoom. Schlenker's assignment of error implicates a court rule and two constitutional rights.

*Question 1: Whether the videoconference appearances breached Shaun Aaron Schlenker's right, under court rule, to counsel?*

*Answer 1: Yes.*

First the court rule. CrR 3.4 declares:

> (a) Presence Defined. Unless a court order or this rule specifically requires the physical presence of the defendant, the defendant may appear remotely or through counsel. Appearance through counsel requires that counsel either (i) present a waiver the defendant has signed indicating the defendant wishes to appear through counsel or (ii) affirm, in writing or in open court, that this is the defendant's preference.
> (b) When Necessary. The defendant shall be present physically or remotely (in the court's discretion) at the arraignment (if one is held), at every stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise

provided by these rules, or as excused or excluded by the court for good
cause shown.

. . . .

(e) Videoconference Proceedings.

(1) *Authorization.* Preliminary appearances held pursuant to CrR
3.2.1, arraignments held pursuant to this rule and CrR 4.1, bail hearings
held pursuant to CrR 3.2, and trial settings held pursuant to CrR 3.3, may
be conducted by video conference in which all participants can
simultaneously see, hear, and speak with each other. Such proceedings
shall be deemed held in open court and in the defendant's presence for the
purposes of any statute, court rule or policy. All video conference hearings
conducted pursuant to this rule shall be public, and the public shall be able
to simultaneously see and hear all participants and speak as permitted by
the trial court judge. Any party may request an in person hearing, which
may in the trial court judge's discretion be granted.

. . . .

(3) *Standards for Video Conference Proceedings.* The judge,
counsel, all parties, and the public must be able to see and hear each other
during proceedings, and speak as permitted by the judge. The video and
audio should be of sufficient quality to ensure participants are easily seen
and understood. *Video conference facilities must provide for confidential
communications between attorney and client*, including a means during the
hearing for the attorney and the client to read and review all documents
executed therein, and security sufficient to protect the safety of all
participants and observers.

(Emphasis added) (boldface omitted).

On February 29, 2020, the Washington governor declared a state of emergency due

to the COVID-19 pandemic. Our Supreme Court authorized criminal defendants to

appear via video. The Court issued an order reading:

14

> Courts should continue to hear **in custody** criminal and juvenile offender matters by telephone, video or other means that do not require in person attendance when appropriate.

Fifth Revised & Extended Ord. Regarding Ct. Operations, No. 25700-B-658, at 7, *In re Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency*, (Wash. Feb. 19, 2021) https://www.courts.wa.gov/content/publicUpload/ Supreme%20Court%20Orders/25700-B-658.pdf [https://perma.cc/F2PD-LEXX].  The Supreme Court order added that:

> "[f]or all hearings that involve a critical stage of the proceedings, courts *shall provide a means* for defendants and respondents to have the opportunity for private and continual discussion with their attorney.

Fifth Revised & Extended Ord. Regarding Ct. Operations, No. 25700-B-658, at 11 (emphasis added).

The State violated CrR 3.4 and the Supreme Court order by conducting hearings by video conference without affording confidential communications between Shaun Aaron Schlenker and his counsel.  The superior court's comments on March 12, 2021, suggest that Schlenker could have conferred privately with his lawyer, but the court did not identify a means of private conversation.  On appeal, the State does not suggest that the videoconferencing facilities permitted private conversations.

15

*Question 2: Whether the videoconference appearances breached Shaun Aaron*

*Schlenker's constitutional right to counsel?*

*Answer 2: Yes.*

We move to constitutional provisions. Shaun Aaron Schlenker's assignment of

error touches two constitutional rights: the right to be present and the right to counsel.

Criminally accused persons have a constitutional right to be present at all critical stages of

court proceedings. *State v. Jones*, 185 Wn.2d 412, 426, 372 P.3d 755 (2016). In his

appeal, Schlenker does not contend that the virtual hearing process breached his right to

be present.

The Sixth Amendment to the United States Constitution, and article I, section 22

of the Washington Constitution guarantee an accused assistance of counsel. *State v.*

*Heddrick*, 166 Wn.2d 898, 909-10, 215 P.3d 201 (2009). The constitutional right to

counsel demands more than just access to a warm body with a bar card. *State v.*

*Anderson*, 19 Wn. App. 2d 556, 562, 497 P.3d 880 (2021). The constitutional right to the

assistance of counsel conveys with it a reasonable time for consultation and preparation,

which includes the opportunity for private and continual discussions between the

defendant and his attorney at least during critical stages of the prosecution. *State v.*

*Hartzog*, 96 Wn.2d 383, 402, 635 P.2d 694 (1981); *Bragg v. State*, 28 Wn. App. 2d 497, 504, 536 P.3d 1176 (2023).

The ability for attorneys and clients to consult privately need not be seamless, but it must be meaningful. *State v. Anderson*, 19 Wn. App. 2d 556, 562 (2021). The trial judge must make sure that attorneys and clients have the opportunity to engage in private consultation. *State v. Anderson*, 19 Wn. App. 2d 556, 562 (2021). The trial court must also provide guidance to the accused and his counsel about how to confer privately. *Bragg v. State*, 28 Wn. App. 2d 497, 506 (2023). A trial court must not place an unreasonable expectation on a defendant to interrupt a proceeding to assert his right to confer with counsel. *Bragg v. State*, 28 Wn. App. 2d 497, 509 (2023). In assessing a violation of the right, this court should consider the totality of the circumstances, including whether the trial court explicitly established a process for privileged communications. *Bragg v. State*, 28 Wn. App. 2d 497, 507 (2023). Like the right to counsel in general, whether the court violated the defendant's constitutional right to privately confer with his attorney, is a very fact-specific inquiry. *State v. Gonzales-Morales*, 138 Wn.2d 374, 386, 979 P.2d 826 (1999).

We review this court's three recent decisions involving videoconference appearances by the defendant. We glean important factors from each decision. We begin with Division Three's ruling in *State v. Anderson*, 19 Wn. App. 2d 556 (2021).

Deshawn Anderson assigned error to his inability to confer confidentially with his counsel during a resentencing hearing. Anderson attended the resentencing hearing via video from jail. His attorney appeared telephonically. During the brief hearing, no one mentioned whether Anderson had consented to appear by videoconference. No one mentioned whether Anderson and his attorney could communicate during the hearing. The parties agreed to modify the judgment and sentence according to the three issues identified in an earlier appellate decision. When addressed by the court, Anderson confirmed he agreed with the modifications.

In *State v. Anderson*, this court agreed that the resentencing hearing procedure violated Deshawn Anderson's constitutional right to counsel. The superior court never established any procedure for Anderson and his attorney to confidentially communicate during the hearing. Anderson and his attorney were not physically located in the same room, where they might have been able to at least engage in nonverbal communication. The circumstances strongly implied the inability for privileged communications. We did

18

not expect Anderson to assume he had permission to interrupt the judge and court proceedings if he wished to speak with his attorney.

In *State v. Dimas*, ___ Wn. App. 2d ___, 544 P.3d 597 (2024), Jacob Dimas appealed his conviction for rape to Division Two. Dimas appeared at all pretrial hearings from a booth at the jail, while his defense counsel either was present in court or appeared remotely over Zoom. Dimas argued that appearing remotely from a jail booth at court proceedings violated his constitutional right to confer privately with counsel. The superior court never set any ground rules for how Dimas and defense counsel could confidentially communicate during the hearings when Dimas appeared remotely. Dimas did not object to this arrangement at any time in the trial court. Nevertheless, during at last two hearings, Dimas asked to speak with his attorney. The court allowed Dimas and counsel to confer privately in a breakout room. During sentencing, Dimas objected to appearing by Zoom. He later consented to the arrangement when informed the sentencing would be delayed a week if he wished to appear in person.

In *State v. Dimas*, Division Two declined to consider the merits of the appeal because of the absence of manifest constitutional error. We discuss its reasoning later.

Division One addressed a defendant's appearance by videoconference in *Bragg v. State*, 28 Wn. App. 2d 497 (2023). A jury convicted Denver Bragg of three counts of

assault in the first-degree, drive-by shooting, attempting to elude law enforcement, and possession of a stolen firearm. Bragg argued on appeal that the trial court violated his right to confer with his attorney by requiring him to participate in all nontrial hearings via Webex while his counsel appeared in the courtroom. Division One agreed.

Because of the fact specific nature of our inquiry, we discuss in detail the hearings, during which Denver Bragg appeared remotely. After Bragg's arrest and incarceration, the superior court imposed bail at $750,000, which Bragg could not pay. The superior court granted numerous trial continuances at the request of the State and defense counsel. The hearings included a review hearing discussing a plea offer, a review hearing discussing collecting Bragg's DNA sample and Bragg's request to discharge his counsel, a review hearing discussing DNA evidence, and a final pretrial conference discussing the defense retaining a DNA expert. For all twenty pretrial proceedings, Bragg appeared on video via Webex from jail, while his counsel and the State appeared in person before the trial judge. On multiple occasions, Bragg expressed frustration with the pretrial proceedings and distrust of his counsel. During one hearing, defense counsel tried to withdraw due to allegedly irreconcilable conflicts over whether to delay the trial to secure an expert DNA witness. The court denied counsel's motion to withdraw.

During one continuance hearing, Denver Bragg asked the trial court about how he

could speak to his lawyer. The following exchange occurred:

> THE COURT: No. No. Nope, you're not going to talk right now.
> You've got an attorney for that.
> THE DEFENDANT: He's not my attorney right now so can I—
> THE COURT: No. You're not going to do that. I'm going to cut
> you off and mute you if you don't stop.
> THE DEFENDANT: Okay.
> THE COURT: You're not talking to your attorney right now.
> THE DEFENDANT: I know. That's what I'm asking you, *how can I*
> *do that then*?
> THE COURT: You can be quiet, for one.

*Bragg v. State*, 28 Wn. App. 2d 497, 510-11 (2023) (emphasis added).

On appeal, Denver Bragg argued that at least eight of the pretrial hearings were

critical stage proceedings and that the court violated his Sixth Amendment rights because

he could not privately consult with his attorney during those hearings. The State

conceded that those eight hearings identified by Bragg, which entailed a preliminary

appearance, a bail hearing, the arraignment, a trial setting, review hearings, a pretrial

conference, and sentencing, constituted critical stages.

The court ruled that the trial court violated Denver Bragg's right to counsel by not

providing guidance to Bragg and his counsel about how to confer privately during at least

four nontrial critical stage proceedings and by placing an unreasonable expectation on

Bragg to assert his rights. The State did not suggest that the Webex video conferencing

facilities allowed for such communication. The trial court made no record of steps taken to permit confidential communication thereby preventing meaningful appellate review.

*Bragg v. State* and *State v. Anderson* teach that Shaun Aaron Schlenker's remote attendance of pretrial hearings contravened his right to counsel. Schlenker and his counsel appeared in separate rooms. The superior court never established a process by which the two could confer privately. The State does not suggest Schlenker and his attorney could have spoken confidentially.

*Question 3: Whether the breach of Shaun Aaron Schlenker's right to counsel demands reversal of his convictions?*

*Answer 3: Yes.*

We have ruled that Shaun Aaron Schlenker suffered a violation of his Sixth Amendment right to counsel. This ruling does not necessarily lead to a reversal of convictions. In resolving whether to reverse, we must examine the concepts of manifest constitutional error, critical stages in a prosecution, and harmless error.

The three Washington Court of Appeals decision that address videoconference appearances all mention, during the respective opinions, that the right to confer with counsel extends only to "critical stages" of the prosecution. *State v. Dimas*, 544 P.3d 597, 600 (2024); *Bragg v. State*, 28 Wn. App. 2d 497, 503 (2023); *State v. Anderson*, 19 Wn.

22

App. 2d 556, 561 (2021). The state Supreme Court defines a "critical stage" as one during which rights of the defendant "may be lost, defenses waived, privileges claimed or waived, or in which the outcome of the case is otherwise substantially affected." *State v. Heddrick*, 166 Wn.2d 898, 910 (2009). We would have addressed the makeup of a critical stage when answering our first issue except for a recent Washington Supreme Court decision that suggests the identification of a critical stage impacts the reviewing court's standard for reversal not the determination of a constitutional violation. *State v. Heng*, 2 Wn.3d 384, 539 P.3d 13 (2023).

In *State v. Heng*, the State charged Mitchell Heng with murder, arson, and robbery. At a preliminary hearing, the superior court set bail, among other actions. The court afforded Heng no lawyer at the hearing. After his conviction, Heng argued for reversal because of the lack of counsel at the pretrial hearing. The Washington Supreme Court addressed the right to counsel in general, not the narrower subject of the right to confer with counsel.

In *State v. Heng*, the Supreme Court identified the key issue as being whether the preliminary hearing was a critical stage of the prosecution. If so, the failure to have counsel for Mitchell Heng formed structural error requiring automatic reversal. The court narrowed the definition of a critical stage to a pretrial hearing where an error affects and

23

contaminates the entire proceeding. The court reviewed the events that occurred during the preliminary hearing. The trial judge appointed counsel, set bail, and then entered a not guilty plea on Heng's behalf. Heng did not lose his ability to challenge bail at a later hearing. His counsel decided not to challenge bail when counsel appeared at the next hearing. Thus, the preliminary hearing was not a critical stage.

The Supreme Court's holding, in *State v. Heng*, rejecting the preliminary hearing as a critical stage did not end the court's examination of the denial of counsel. The holding simply meant that no structural error occurred. Mitchell Heng was not entitled to automatic reversal. Instead, the court still reviewed the denial of counsel under a constitutional harmless error analysis. The logical extension of the holding means that the right to counsel, including the right to confer with counsel, extends to all hearings, not just critical stage hearings, but the error analysis heightens with a critical stage proceeding.

Under a constitutional harmless error standard, this court presumes prejudice. *State v. Anderson*, 19 Wn. App. 2d 556, 564 (2021). This court will reverse unless the State persuades us beyond a reasonable doubt that the error did not contribute to the verdict. *State v. Orn*, 197 Wn.2d 343, 359, 482 P.3d 913 (2021); *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019). We place this heavy burden on the State to

deter conduct that undermines the principle of equal justice. *State v. Jackson*, 195 Wn.2d 841, 856, 467 P.3d 97 (2020).

We return to our trio of recent Court of Appeals decisions. In *State v. Anderson*, 19 Wn. App. 2d 556, 564 (2021), Division Three first noted that Deshawn Anderson had failed to object to his videoconference appearances before the trial court. We recognized, however, that the fundamental right to assistance of counsel could not be lost without a specific waiver rather than the failure to object. Thus, Anderson could raise his inability to confer with counsel for the first time on appeal as manifest constitutional error.

Division Three next applied the constitutional harmless error standard. The court observed that the error occurred during a resentencing hearing. During that hearing, Deshawn Anderson received all of the requests he forwarded to the court. Therefore, the State proved harmless error beyond a reasonable doubt. We refused to reverse Anderson's convictions or his resentencing.

In *State v. Dimas*, __ Wn. App. 2d ___, 544 P.3d 597 (2024), the Division Two decision, the superior court established no procedure for Jacob Dimas and defense counsel to confidentially communicate during the hearings when Dimas appeared remotely. But when Dimas asked to speak with his attorney, the court allowed Dimas and counsel to confer privately in a breakout room. He consented to appearing remotely at

sentencing when informed the sentencing would be delayed if he wished to appear in person.

Division Two declined to hear the merits of Jacob Dimas' complaint about appearing by videoconference because Dimas failed to show manifest constitutional error. Although the court mentioned the lack of an objection before the superior court, the court primarily based its conclusion on Dimas' failure to show his inability to confer with defense counsel would have made a difference. Many of the hearings entailed a continuance of the trial over the objection of Dimas, but the superior court had legitimate reasons for the continuance. Dimas also could not show a delay in the trial affected the outcome. A motion to impeach the victim with prior convictions involved only questions of law, and Dimas could not have relayed any information to his attorney to assist in presenting the motion. The court's ruling effectively shifted the burden to Dimas to show prejudice.

In *Bragg v. State*, 28 Wn. App. 2d 497 (2023), Division One did not directly address whether Denver Bragg objected to the superior court about appearing by videoconference. Instead, the court followed *State v. Anderson* and deemed the denial of the right to confer as constituting manifest constitutional error, reviewable for the first time on appeal under RAP 2.5(a)(3) regardless of any objection to the appearance before

the superior court. Division One went on to reject the notion that the videoconference appearance constituted structural error, necessitating automatic reversal. Nevertheless, the court applied the constitutional harmless error standard and held that the State did not carry its burden to show beyond a reasonable doubt that Bragg's inability to confer with his counsel at several critical stage proceedings was harmless. Thus, this court reversed the convictions.

Division One, in *Bragg v. State*, analyzed the following events occurring during what it called critical stage hearings, but what the Supreme Court, after *State v. Heng*, might declare otherwise. During a hearing to discuss a plea offer, Bragg's counsel advised the court that Bragg refused the State's plea offer of 271 months. Counsel further advised the court that he explained the offer to Bragg in a letter and that the State would not bargain further. Counsel warned Bragg that, if he refused the plea offer and a jury found him guilty, he faced a sentence of over 700 months based on his offender score and the consecutive nature of serious violent offenses and firearm enhancements. During this hearing, defense counsel also discussed his "tense relationship" with Bragg but without significant detail. The court asked Bragg if he wished to address the court, and Bragg declined. Division One reasoned that, if Bragg and his counsel had been able to conduct a confidential conversation during the plea discussion about the severity of possible jail

time, Bragg may have accepted the offer. The ability to confer with counsel in-person, in close proximity, and with the benefit of the court's presence may have induced Bragg to further confer with his counsel regarding the plea offer. Acceptance of a plea offer would not have changed whether Bragg was incarcerated, but the ability to confer at that moment may have led to a significant reduction in the length of his sentence.

During another hearing, the parties discussed Denver Bragg's refusal to give a DNA sample. Bragg refused to submit to the swab test, arguing his DNA was already on file. Bragg also expressed distrust of his counsel, the prosecutor, and the corrections officers taking his sample. As part of this distrust, Bragg complained to the court that he had been trying to fire his counsel, but the court would not permit him. Bragg further argued that, per the court order to collect his DNA, the time frame for collection had expired. Bragg insisted that his attorney should have made this argument for him. Bragg argued with the court until it muted him. Division One reasoned that, if Bragg and his counsel could have conferred privately, the relationship between attorney and client may have improved and Bragg may have better understood the gravity of the DNA evidence.

At a third hearing, Denver Bragg's attorney moved to withdraw as counsel. Defense counsel told the court that he received DNA test results the day before, just one week before trial, and that he wanted an independent expert to review the results. Bragg

insisted he did not need an expert and wanted to proceed to trial. Following a long colloquy with Bragg and his attorney about their relationship, the superior court told counsel that he could then have a conversation with Bragg about the DNA evidence, but the court never suggested that the conversation could happen privately. This reviewing court reasoned that, had attorney and client then conferred privately, the attorney may have better explained the gravity of the DNA evidence and encouraged Bragg to either retain an expert or open plea discussion.

During the last hearing, Denver Bragg's counsel expressed concerns about Bragg's competency to participate in his defense because he unequivocally insisted on trial the next week. He refused to retain experts. He erroneously believed the State's DNA evidence helped him. Bragg told the court that he interpreted the results of the DNA test as showing the complete opposite of what his attorney told him. This court reasoned that, with a private conversation with counsel, the attorney could have encouraged Bragg to agree to a continuance to retain an expert because of the gravity of the DNA results or to reconsider the State's plea offer.

In discussing the ramifications of the inability to confer privately, Division One, in *Bragg v. State*, always contemplated reasonable possibilities, not probabilities, when assessing prejudice. This court rejected the State's contention that Denver Bragg's

29

frequent interruption of the trial court showed he understood he could have spoken to his attorney and knew how to engage in a private discussion with his counsel. The court also rejected the argument that a private conference would have accomplished nothing because of the strained relationship between Bragg and his counsel. A critic might accuse the court of spiraling into speculation when answering the State's assertions.

We note that, had Division One required Denver Bragg to show manifest constitutional error, as Division Two required of Jacob Dimas, Bragg likely would have lost his appeal. The demands of manifest constitutional error shift the burden of showing prejudice to the accused. Bragg would have struggled to satisfy this onus.

We need not determine if any error in Shaun Aaron Schlenker's pretrial proceedings constituted manifest constitutional error. Schlenker preserved his right to assign error to any violation of his Sixth Amendment rights by objecting to the videoconferencing on at least two occasions. He complained of the inability to confer privately with his attorney, while his speech traveled the world on the web.

We conclude, based on *Bragg v. State*, that one or more of Shaun Aaron Schlenker's pretrial hearings constituted a critical stage of the proceeding. Nevertheless, whether any of the hearings involved a critical stage is unimportant because, under either a structural error analysis or a constitutional harmless error analysis, the result remains the

same.  Under *State v. Heng*, regardless of whether the accused suffered a denial of the right to counsel during a critical stage, we still apply a constitutional harmless error standard.

Shaun Schlenker does not identify any time when he wanted to, but could not, communicate with his attorney privately.  Nevertheless, he possesses no burden to show prejudice.  The State who possesses the converse burden, does not attempt to do so.  The State does not seek to establish harmless error.  To the contrary, the State surprisingly completely ignores Schlenker's Sixth Amendment assignment of error.

We note that Shaun Aaron Schlenker's pretrial proceedings echoed the proceedings in *Bragg v. State*.  Unlike in *State v. Anderson*, the trial court did not grant all of Schlenker's request.  To the contrary, the superior court denied most, if not, all requests.  During one hearing, Schlenker's bail was set at $100,000 and maintained at this amount despite various requests for reconsideration, all when Schlenker and his attorney were separated.  Denial of bail comes with heavy consequences for the accused.  *State v. Heng*, 2 Wn.3d 384, 396 (2023).  An individual detained pretrial is more likely to be convicted and more likely to plead guilty in light of the pressures of incarceration.  *State v. Heng*, 2 Wn.3d at 396 (2023).  According to the United States Supreme Court, the period from arraignment to trial is perhaps the most critical period of the proceedings

31

during which the accused requires the guiding hand of counsel. *Powell v. Alabama*, 287 U.S. 45, 57, 69, 32 S. Ct. 55, 77 L. Ed. 158 (1932). The Supreme Court in *State v. Heng* ruled that the initial bail hearing did not entail a critical stage only because Mitchell Heng, after being appointed with counsel, could apply to reduce bail without prejudice from the earlier ruling.

Shaun Schlenker underwent a competency evaluation and was determined to be competent. He encountered many conflicts with multiple attorneys, which resulted in the discharge of several attorneys and appointment of new counsel. All this and more occurred at hearings where Schlenker could not privately and continuously confer with his attorneys. We cannot rule out a reasonable possibility that an opportunity for private consultation might have influenced Schlenker's decisions, his counsel's strategy, or otherwise impact the outcome of trial.

Count II – Malicious Mischief Conviction

Shaun Aaron Schlenker contends the State presented insufficient evidence to convict him of second degree malicious mischief as charged in count II. The due process clause of the Fourteenth Amendment requires that the prosecution prove every element of an offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). This Court reviews challenges to the sufficiency of the

evidence by considering whether "any rational trier of fact, viewing the evidence in a light most favorable to the state, could find the essential elements of the charged crime beyond a reasonable doubt." *State v. Longshore*, 141 Wn.2d 414, 420-21, 5 P.3d 1256 (2000). When a defendant asserts that the evidence was insufficient, he inherently concedes the validity of the state's evidence and all reasonable inferences derived from it. *State v. Homan*, 81 Wn.2d 102, 106, 330 P.3d 182 (2014). If the State places an allegation or adds an added element to the crime in the to-convict instruction, the addition becomes the law of the case and must be proved by the state beyond a reasonable doubt, just like any other element. *State v. Hickman*, 135 Wn.2d 97, 101-02, 954 P.2d 900 (1998); *State v. Nam*, 136 Wn. App. 698, 706-07, 150 P.3d 617 (2007).

On appeal, Shaun Schlenker contends that jury instruction 9, which instructed on count II, demanded that the jury find that he caused $750 of damage respectively to The Performing Arts Center, The Elks Lodge, *and* Anchor Realty. The instruction read in part:

> (1) That on or about February 14, 2021, the defendant caused physical damage to the property of Long Beach Performing Art Center, The Elks Lodge, and Anchor Realty in an amount exceeding $750;

Schlenker concedes that, under the malicious mischief statute, the State may have convicted him for second degree malicious mischief had the jury instruction permitted a

33

conviction if the damage to the three buildings in the aggregate exceeded $750.

Nevertheless, under *State v. Hickman*, jury instruction 9 added to the State's burden of

proof. The State does not argue to the contrary, but simply asks this court to defer to the

superior court's ruling that sufficient evidence supported the guilty verdict.

We agree with Shaun Aaron Schlenker that the reasonable reading of jury

instruction 9 required the State to prove separate damage to each of the three buildings of

more than $750. The trial record only establishes this minimum value for The Performing

Arts Center and the Elks Lodge. The testimony did not prove any amount for the damage

to Anchor Realty's building. Therefore, the State did not meet its burden to convict

beyond a reasonable doubt on Count II.

Voluntary Intoxication Jury Instruction

Shaun Aaron Schlenker assigns error to the superior court's refusal to instruct the

jury on his voluntary intoxication defense. Since we otherwise remand the prosecution

for a new trial, we direct the trial court to entertain anew Schlenker's request for such an

instruction based on the evidence at any new trial.

CONCLUSION

We reverse all convictions of Shaun Aaron Schlenker. We remand for a new trial of all charges except for count 2, malicious mischief. The superior court is directed to dismiss count 2.

*Fearing, J.*

Fearing, J.

WE CONCUR:

Cooney, J.

Staab, A.C.J.

35